681 A.2d 30

Steven Howard OKEN

v.

STATE of Maryland.

No. 80, Sept. Term, 1994.

Court of Appeals of Maryland.

June 13, 1996.

Reconsideration Denied July 25, 1996.

258

260

Fred Warren Bennett, Christopher M. Davis, both on brief, Washington, DC, for Appellant.

Ann N. Bosse, Asst. Atty. Gen., J. Joseph Curran, Jr., Atty. Gen., both on brief, Baltimore, MD, for Appellee.

Argued before MURPHY, C.J., and ELDRIDGE, CHASANOW, KARWACKI, BELL and RAKER, JJ., and JOHN F. McAULIFFE, Associate Judge of the Court of Appeals (Retired), Specially Assigned.

RAKER, Judge.

Steven Howard Oken was found guilty by a Baltimore County jury of first degree murder, first degree sexual offense, burglary and the use of a handgun in a crime of

violence. The same jury sentenced him to death. On direct appeal, this Court affirmed the convictions and the sentences for the first degree murder, the sexual offenses and the handgun violation. *Oken v. State*, 327 Md. 628, 612 A.2d 258 (1992), *cert. denied*, 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993) (*Oken I* ). We reversed the burglary conviction on the grounds of insufficiency of evidence. *Id.*

Oken filed a petition for post-conviction relief pursuant to Maryland Code (1957, 1992 Repl. Vol., 1995 Supp.) Art. 27, § 645A–J, the Uniform Post–Conviction Procedure Act.[1] After an evidentiary hearing, Judge Dana Levitz of the Circuit Court for Baltimore County filed a well-reasoned opinion and order denying post-conviction relief. We granted Oken's application for leave to appeal. We shall affirm.

On November 1, 1987, Oken sexually assaulted and murdered Dawn Garvin at her home in Baltimore County. The facts that led to Oken's conviction and sentence were set out in *Oken I:*

> At midnight on Sunday, November 1, 1987, Keith Douglas Garvin arrived at the United States Navy base in Oceana, Virginia. Mr. Garvin, who had a pass from his naval superiors, had just spent the weekend with his wife, Dawn Garvin, at their apartment in the Baltimore County community of White Marsh and was returning to his station in Oceana. Upon his arrival at the base, Mr. Garvin attempted to call his wife to notify her that he had arrived safely. Although the telephone rang at their White Marsh apartment, there was no answer. After making several additional unsuccessful attempts to call his wife, Mr. Garvin became worried and telephoned his father-in-law, Frederick Joseph Romano. Because Mr. Romano lived in close proximity to the Garvins' apartment, Mr. Garvin asked Mr. Romano to check on his wife. Mr. Romano agreed, and attempted to telephone his daughter twice. Both times there was no answer. Concerned about the fact that numerous calls to

---

**1.** Unless otherwise indicated, all statutory citations herein are to Maryland Code (1957, 1992 Repl. Vol., 1995 Supp.) Article 27.

his daughter had gone unanswered, Mr. Romano decided to drive to his daughter's apartment.

When Mr. Romano arrived at his daughter's apartment, he found the front door to the apartment ajar, all the lights in the apartment turned on, and the television blaring. Sensing that something was wrong, Mr. Romano rushed into the apartment and found his daughter, Dawn, in the bedroom lying on the bed nude with a bottle protruding from her vagina. While attempting to give her cardiopulmonary resuscitation ("CPR"), Mr. Romano observed that there was blood streaming from her forehead. He immediately called for assistance, and paramedics arrived shortly thereafter. A paramedic then began to administer CPR, but his efforts were in vain. Dawn Marie Garvin was dead.

At 2:30 a.m., on November 2, Detective James Roeder of the Baltimore County Police Department arrived at the Garvins' apartment to inspect the scene of the murder. Detective Roeder testified that when he entered the Garvins' apartment he saw no signs of forced entry. Once inside, he observed a brassiere, a pair of pants, tennis shoes, a shirt, and a sweater on the floor near the sofa in the living room. The brassiere was not unhooked, but instead, was ripped on the side. The pants were turned inside out. Roeder also noticed a small piece of rubber on the floor near the television set. In the bedroom, Roeder found two spent .25 caliber shell casings on the bed, one of which was lying on top of a shirt. The shirt was blood stained and had what Roeder believed to be a bullet hole in it.

An autopsy of Ms. Garvin's body revealed that she had died as the result of two contact gunshot wounds; one of the bullets entered at her left eyebrow and the other at her right ear.

327 Md. at 634–35, 612 A.2d at 261.

Less than two weeks after Oken murdered Dawn Garvin, he sexually assaulted and murdered his sister-in-law, Patricia Hirt, at his Maryland home. He then fled Maryland for Maine, where he murdered Lori Ward, the desk clerk at his Maine hotel. He was arrested in Maine on November 17,

1987, and was ultimately convicted in Maine for first degree murder, robbery with a firearm, and theft arising out of the Ward homicide.[2] *See State v. Oken,* 569 A.2d 1218 (Me.), *cert. denied,* 498 U.S. 818, 111 S.Ct. 62, 112 L.Ed.2d 36 (1990).

Oken was returned to Maryland where he faced separate prosecutions for charges arising out of the Garvin and Hirt homicides. He was indicted in the Circuit Court for Baltimore County in the Garvin case for first degree murder, sexual offenses, burglary, daytime housebreaking, robbery with a dangerous or deadly weapon, theft, and a handgun violation. The State notified Oken of its intent to seek the death penalty and advised him that as aggravating circumstances, it intended to establish that (1) the defendant committed the murder in the first degree of Dawn Garvin while committing or attempting to commit a first degree sex offense upon Dawn Garvin, and (2) the defendant committed the murder of Dawn Garvin in the first degree while committing or attempting to commit robbery of Dawn Garvin. *See* Art. 27, § 412(b). Oken entered pleas of not guilty and not criminally responsible. *See* Maryland Code (1982, 1994 Repl. Vol., 1995 Supp.) § 12–109 of the Health–General Article; Maryland Rule 4–242. At the trial, Oken was represented by defense counsel, Benjamin Lipsitz.

The State's evidence as to criminal agency was very strong. The murder weapon, a handgun, was found in Oken's home shortly after the murder and a rubber portion of Oken's tennis shoe was found in Dawn Garvin's living room on the night of the murder. In addition, several witnesses at trial identified Oken as the person in the neighborhood who had attempted to gain entry to residences in the vicinity of the Garvin home a few days prior to the murder.

On January 18, 1991, a jury in the Circuit Court for Baltimore County found Oken guilty of murder in the first

---

**2.** The Maryland presentence investigation report indicated that in Maine, Oken was sentenced to life without parole on the murder charge, twenty years on the robbery charge, and five years on the theft charge, all sentences to run concurrently.

degree (on theories of felony murder and premeditated murder), first degree sexual offense, burglary, and use of a handgun in a crime of violence. The jury acquitted Oken of the robbery charge. Pursuant to Maryland Rule 4–314, Oken elected a court trial on the issue of criminal responsibility. Judge James Smith concluded that Oken was criminally responsible.

A capital sentencing proceeding commenced on January 24, 1991 before the same jury that determined Petitioner's guilt. The State incorporated all the testimony and evidence from the guilt/innocence phase. The verdict sheet indicated that one or more of the jurors, but fewer than all twelve, found as mitigating circumstances "(1) fact of life sentence, (2) sexual sadism, and (3) substance abuse." On January 25, the jury unanimously determined the sentence to be death. On the remaining counts, Judge Smith imposed a sentence of life imprisonment for the first degree sexual offense, and consecutive terms of twenty years each for the burglary and the handgun violation.[3] This post-conviction proceeding reviews only the Baltimore County proceedings relating to the murder of Dawn Garvin. Additional facts will be recounted as necessary in our discussion of the issues raised by Oken in this appeal.

Before this Court, Oken asks us to consider claims of ineffective assistance of counsel and errors of the trial court at both the guilt/innocence stage and the sentencing stage. He asks us to consider the following questions:

I. Whether the trial court's voir dire questions comported with the dictates of *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), and *Evans v. State,* 333 Md. 660, 637 A.2d 117, *cert. denied,* —— U.S. ——, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994), in identifying prospective jurors with a pro-death penalty bias?

---

**3.** Following Oken's conviction in this case, he pled guilty to the murder of Patricia Hirt. *See Oken v. State,* 327 Md. 628, 644 n. 4, 612 A.2d 258, 266 n. 4 (1992), *cert. denied,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993).

II. Whether the trial court erred at the sentencing proceeding in failing to instruct the jury that it could consider, as a non-statutory mitigating factor, that appellant was serving a sentence of life without parole under Maine law?

III. Whether Petitioner's trial counsel provided ineffective assistance of counsel?

IV. Whether the post-conviction court erred in not allowing Petitioner to obtain his own hair samples taken from him at the time of his arrest for purposes of conducting forensic tests to establish Petitioner's substance abuse at the time of the offense?

V. Whether the trial court erred in allowing the jury to use the underlying felony murder as an aggravator in the penalty phase of the trial?

VI. Whether the trial court erred in failing to instruct the jury that under Art. 27, § 413(g)(8), the "catch-all provision," it could list as a mitigating factor its desire to extend mercy to Petitioner.

We shall address each of these questions *seriatim*.

**I. Whether the trial court's voir dire questions comported with the dictates of *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), and *Evans v. State*, 333 Md. 660, 637 A.2d 117, *cert. denied*, —— U.S. ——, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994), in identifying prospective jurors with a pro-death penalty bias?**

Before this Court, Petitioner contends that despite his specific request for appropriate "reverse-*Witherspoon*"[4] questions, the trial court's voir dire was inadequate to identify those prospective jurors who harbored "any convictions in support of the death penalty" in violation of *Morgan v. Illinois*, 504 U.S. 719, 726, 112 S.Ct. 2222, 2228, 119 L.Ed.2d

---

4. "Reverse-*Witherspoon*" voir dire is also known as "life qualification" of the jury. See *Morgan v. Illinois*, 504 U.S. 719, 724, 112 S.Ct. 2222, 2227, 119 L.Ed.2d 492, 499 (1992).

492 (1992), and *Evans v. State*, 333 Md. 660, 637 A.2d 117, *cert. denied,* —— U.S. ——, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994).[5] Judge Levitz found that the questions asked by the trial judge were sufficient to comply with *Morgan* and *Evans.*

The State contended before Judge Levitz, and before this Court, that because Oken did not raise this claim on direct appeal, it is waived. *See Oken I*, 327 Md. at 634–80, 612 A.2d at 260–85. Oken argues that the right to "reverse-*Witherspoon* " voir dire is a right that cannot be waived unless the defendant knowingly and intelligently waives the right on the record. Because Oken did not knowingly and intelligently relinquish this right, he continues, his failure to raise this issue on direct appeal cannot constitute a waiver. Alternatively, he argues that if this Court finds waiver, then circumstances exist that excuse appellate counsel's failure to raise the *Morgan* claim on direct appeal.

The Maryland Uniform Post Conviction Procedure Act, Art. 27, § 645A(c)(1), provides in pertinent part:

───────

5. In his petition for post-conviction relief, petitioner raised his *Morgan* claim in three different ways: (1) trial court error in failing to ask his requested "reverse-*Witherspoon* " questions of the venire panel; (2) ineffective assistance of trial counsel for failure to object to the trial court's voir dire; and (3) ineffective assistance of appellate counsel for failure to raise the *Morgan* issue on direct appeal.

Before this Court, Oken raises only the claim of trial court error. In his brief, Oken states that he is not now claiming that his counsel's performance during the voir dire was ineffective. Oken also abandons his claim of ineffective assistance of appellate counsel. He reasons that because this Court did not restrict the issues in the Order granting the application for leave to appeal and the only remedy available to Oken on the ineffective assistance claim is a belated appeal, the proceeding before this Court is in effect his belated appeal on the *Morgan* issue. We disagree with Oken's interpretation of the nature of this appeal. We said in *Williams v. State*, 292 Md. 201, 205, 438 A.2d 1301, 1303 (1981), that

> if the application for leave to appeal is granted, the case shall be treated as any other appeal. Section 645–I goes on to state that "[i]f the application to prosecute such appeal shall be granted, the procedure thereafter shall be in conformity with the Maryland Rules."

*See Kelly v. Warden,* 243 Md. 717, 718, 222 A.2d 835, 836 (1966) (post-conviction is not a substitute for an appeal).

> [A]n allegation of error shall be deemed to be waived when a petitioner could have made, but intelligently and knowingly failed to make, such allegation before trial, at trial, on direct appeal (whether or not the petitioner actually took such an appeal) ... unless the failure to make such allegation shall be excused because of special circumstances.

When a petitioner had a prior opportunity to raise an allegation of error but did not do so, the statute creates a rebuttable presumption that the petitioner intelligently and knowingly failed to make the allegation. Art. 27, § 645A(c)(2). If the presumption is not rebutted, the waiver shall be excused if the petitioner establishes the existence of special circumstances. Art. 27, § 645A(c)(1); *Curtis v. State,* 284 Md. 132, 140, 395 A.2d 464, 469 (1978).

In *Curtis,* this Court addressed the question of when the "intelligently and knowingly" waiver test of the statute was applicable. We stated in *Curtis* that, in assessing waiver, Art. 27, § 645A(c) does not require application of the "intelligently and knowingly" standard of waiver to every constitutional right. 284 Md. at 149–50, 395 A.2d at 474. Judge Eldridge, writing for the Court, stated:

> [W]e believe that the Legislature, when it spoke of "waiver" in subsection (c) of Art. 27, § 645A, was using the term in a narrow sense. It intended that subsection (c), with its "intelligent and knowing" standard, be applicable only in those circumstances where the waiver concept of *Johnson v. Zerbst* [304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)] and *Fay v. Noia* [372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963)] was applicable. Other situations are beyond the scope of subsection (c), to be governed by case law or any pertinent statutes or rules. Tactical decisions, when made by an authorized competent attorney, as well as legitimate procedural requirements, will normally bind a criminal defendant.

*Id.*

In *Curtis,* we recognized the potential for chaos if every time counsel made a tactical decision or a procedural default

the "intelligently and knowingly" waiver standard was triggered. We said:

> For example, under such an interpretation of the statute, for a criminal defendant to be bound by his lawyer's actions, the lawyer would have to interrupt a trial repeatedly and go through countless litanies with his client. One of the basic principles of statutory construction is that a statute should not be construed to lead to an unreasonable or illogical result. It is hardly conceivable that the Legislature, in adopting § 645A(c), could have intended to use the word "waiver" in its broadest sense, thereby requiring that the "intelligent and knowing" standard apply every time an issue was not raised before.

*Id.* at 149, 395 A.2d at 474 (citations omitted).

██ It is clear from the testimony of appellate counsel at the post-conviction hearing that her failure to raise the adequacy of the voir dire on appeal was a deliberate one. Counsel testified that she believed that the questions asked by the court satisfied the standard set out in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and that she did not fully appreciate the significance of *Morgan* until this Court decided *Evans*. The decision whether to raise an issue on appeal is quintessentially a tactical decision of counsel. *Hunt v. Smith*, 856 F.Supp. 251, 257 (D.Md.1994), *aff'd sub nom.*, *Hunt v. Nuth*, 57 F.3d 1327 (4th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 724, 133 L.Ed.2d 676 (1996); *cf. Jones v. Barnes*, 463 U.S. 745, 750–53, 103 S.Ct. 3308, 3312–14, 77 L.Ed.2d 987, 994–95 (1983) (the role of appellate counsel is to choose which arguments are best to pursue). Whether or not Oken's appellate counsel appreciated the impact of *Morgan* on this case, the "reverse-*Witherspoon*" issue could have been raised on direct appeal. Oken's counsel made the deliberate decision not to raise the issue.

██ We hold that the right to ask "reverse-*Witherspoon*" questions on voir dire may be relinquished by failure to raise the claim on direct appeal and is not controlled by the "intelligent and knowing" waiver standard of *Johnson v.*

*Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), thus falling outside Art. 27, § 645A(c). *Compare, e.g. McElroy v. State,* 329 Md. 136, 140 n. 1, 148–49, 617 A.2d 1068, 1070 n. 1, 1074–75, 1076 (1993) (guilty plea); *Trimble v. State,* 321 Md. 248, 262, 582 A.2d 794, 801 (1990) (jury sentencing in a capital case); *Gilliam v. State,* 320 Md. 637, 659–60, 579 A.2d 744, 755 (1990), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991) (*Gilliam I* ) (right to jury trial); *Curtis,* 284 Md. at 150–51, 395 A.2d at 474–75 (effective assistance of counsel); *Jourdan v. State,* 275 Md. 495, 507, 341 A.2d 388, 395 (1975) (double jeopardy); *Strosnider v. Warden,* 245 Md. 692, 694, 226 A.2d 545, 547 (1967) (confession obtained in violation of right to counsel and right to remain silent). We reach this conclusion based upon our review of the nature of this right and a consideration of the surrounding circumstances under which the right arises. *Curtis,* 284 Md. at 147, 395 A.2d at 473.

In *Morgan,* the Supreme Court found that a "juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Morgan,* 504 U.S. at 729, 112 S.Ct. at 2229, 119 L.Ed.2d at 502. Under *Morgan,* a defendant is entitled during voir dire, *upon request,* to "inquiry discerning those jurors who, even prior to the State's case-in-chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty." *Morgan,* 504 U.S. at 736, 112 S.Ct. at 2233, 119 L.Ed.2d at 507. The trial judge need not make this inquiry *ex mero motu.* In other words, absent a request, a trial court does not have an affirmative obligation to make this inquiry. Absent a request, the failure to ask "reverse-*Witherspoon* " questions is not error. It follows that because the right is triggered only upon request, it is subject to traditional procedural default and not the "intelligently and knowingly" standard of waiver. Thus, Oken's failure to raise this claim on direct appeal constituted waiver.

Oken contends that circumstances exist to excuse his waiver. First, he suggests that because *Morgan* was decided by the Supreme Court on June 15, 1992, appellate counsel had insufficient time to learn of the applicability of that case to the instant case.[6] Second, he argues that *Morgan* imposed "new requirements on *voir dire* proceedings" and therefore, because his case was pending, he was entitled to the benefit of *Morgan* as a matter of law.

Under Maryland Rule 8–131, this Court retains discretion to excuse a waiver. Oken's argument to excuse the waiver, however, is without merit. The "reverse-*Witherspoon*" right to exclude jurors for cause was established by the Supreme Court in 1988 in *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). We recognized this right in *Hunt v. State,* 321 Md. 387, 583 A.2d 218 (1990), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991). In *Bowie v. State,* 324 Md. 1, 21–24, 595 A.2d 448, 457–59 (1991), decided prior to Oken's direct appeal, we recognized that a defendant had a right to voir dire that would identify prospective jurors who harbored disqualifying biases in favor of the death penalty. *See also Stamper v. Muncie,* 944 F.2d 170, 177 (4th Cir.1991) (recognizing that a defendant in Virginia had a right to "reverse-*Witherspoon*" voir dire); *Smith v. Balkcom,* 660 F.2d 573, 578 (5th Cir.1981), *modified,* 671 F.2d 858, *stay recalled,* 677 F.2d 20, *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982) (recognizing right to eliminate those who would automatically vote to impose death penalty in spite of the evidence); *Sims v. United States,* 405 F.2d 1381, 1384 n. 5 (D.C.Cir.1968) (noting that if Government can ask *Witherspoon* type questions, defendant should be permitted to ask "reverse-*Witherspoon*" questions); *Skipper v. State,* 257 Ga. 802, 364 S.E.2d 835, 839 (1988) (finding that inability fairly to consider life sentence is as disqualifying as an inability to consider death sentence); *Patterson v. Commonwealth,* 222 Va. 653, 283 S.E.2d 212, 216 (1981) (holding that jurors who are biased in favor of death penalty under all circumstances

---

**6.** *Oken I* was decided by this Court on September 17, 1992.

may be eliminated for cause). Accordingly, we find no circumstances excusing the failure to raise this issue on direct appeal.

■ Even if this claim were not waived, we would find no error. The post-conviction court found that the trial court sufficiently life-qualified the jury. We agree.

The voir dire was conducted in a three-part process: first the panel was questioned as a group; next, the prospective jurors were questioned individually in chambers. They were each asked the following four questions:

Do you have any strong feelings, one way or the other, with regard to the death penalty?

Do you feel that your attitude, regarding the death penalty, would prevent or substantially impair you from making a fair and impartial decision on whether the Defendant is not guilty or guilty, based on the evidence presented and the Court's instructions as to the law?

Do you feel your attitude, regarding the death penalty, would prevent or substantially impair you from making a fair and impartial decision on whether the Defendant was or was not criminally responsible by reason of insanity, based on the evidence presented and the Court's instructions on the law?

Do you feel that your attitude, regarding the death penalty would prevent or substantially impair you from sentencing the Defendant, based upon the evidence presented and the Court's instructions as to the law which is applicable?

When a prospective juror responded affirmatively to a question, the trial judge inquired further to explore and disclose the nature of any bias. Finally, the trial court concluded with the catch-all question to members of the entire panel, asking whether there was any reason, either previously undisclosed or whatsoever, that would prevent their returning a fair and impartial verdict based on the evidence presented and the applicable instructions.

The post-conviction court found:

The Court of Appeals in *Evans* specifically sanctioned four questions that should be asked in death penalty cases. Petitioner correctly points out that the trial court in the Dawn Garvin proceeding only asked the first two of these questions as a matter of course and the second two questions, including the *Witherspoon* and the "reverse-*Witherspoon*" questions, were not asked as a matter of course. The language used in *Evans,* however, is not magical. The Court of Appeals was simply approving the questions asked in that case and they did not preclude other language which could satisfy *Ross* and *Morgan.*

After reviewing the transcript, it is the finding of this court that Judge Smith asked sufficient follow up questions to comply with *Morgan* and *Evans.* Anytime any of the jurors indicated they would have a problem sentencing Petitioner because of their views on the death penalty, Judge Smith asked sufficient follow-up questions to allow trial counsel to have a basis to strike for cause. The follow-up questions asked by Judge Smith elicited the same information that would have come out if the judge had asked the two questions specifically mentioned in *Evans.*

Oken contends that Judge Levitz misread his claim. As clarification, he asserts that his complaint does not relate to the sufficiency of the trial court's follow-up questions; he complains that the initial four questions were insufficient to identify prospective jurors who should have been asked follow-up questions. The State contends that the voir dire was adequate to identify all members of the venire whose pro-death penalty views would impair their performance as jurors. We have independently reviewed the record and agree that the voir dire was sufficient.

In *Morgan,* the Supreme Court observed that the Constitution does not require any particular catechism for voir dire, but only that voir dire adequately identify constitutionally unqualified prospective jurors. 504 U.S. at 729, 112 S.Ct. at 2230, 119 L.Ed.2d at 503. The issue before the Supreme Court in *Morgan* was whether the voir dire propounded by

the trial court was sufficient to identify prospective jurors who would automatically vote for the death penalty and thereby fail to follow the law and to consider the evidence of aggravating and mitigating circumstances. 504 U.S. at 734–36, 112 S.Ct. at 2232–33, 119 L.Ed.2d at 506–07. The Court found that merely asking jurors whether they can follow the law or be fair and impartial will not satisfy the constitutional requirements. *Id.* at 735–36, 112 S.Ct. at 2233, 119 L.Ed.2d at 506–07. In *Evans,* Judge Karwacki, writing for this Court, observed

> It is important to note that *Morgan* left the standard for juror exclusion unchanged; jurors may still be excused on the basis of their beliefs about capital punishment if, in the determination of the trial judge, those beliefs will "substantially impair their performance as jurors." *Id.* at 728, 112 S.Ct. at 2229, 119 L.Ed.2d at 502. *Morgan* simply recognizes that the principles first propounded in *Witherspoon v. Illinois* "demand inquiry into whether the views of prospective jurors on the death penalty would disqualify them from sitting." *Morgan,* 504 U.S. at 731, 112 S.Ct. at 2231, 119 L.Ed.2d at 504.

333 Md. at 672–73, 637 A.2d at 117. A juror is disqualified from sitting if the juror would vote automatically for the death penalty. A juror " 'who may have an inclination to favor the death penalty, but who would nevertheless conscientiously apply the law, need not be excused.' " *Id.* at 673, 637 A.2d at 123 (quoting *Hunt v. State,* 321 Md. at 415, 583 A.2d at 231).

■ We find that the voir dire asked by the trial court in this case was adequate to "life qualify" the venire. *Compare Morgan,* 504 U.S. at 735–36, 112 S.Ct. at 2233, 119 L.Ed.2d at 506–07; *with Evans,* 333 Md. at 675, 637 A.2d at 124. Although better questions could have been asked, these questions were adequate to identify those jurors with any bias so that further questions could be propounded. Indeed, *Morgan* recognized the broad discretion of the trial court in the supervision and exercise of voir dire, subject to the constitutional requirement that the voir dire adequately identify those unqualified jurors. 504 U.S. at 729, 112 S.Ct. at 2230, 119

L.Ed.2d at 503. We too have recognized the broad discretion of the trial court in the control of voir dire, and we will not reverse absent a showing of an abuse of discretion. *Davis v. State,* 333 Md. 27, 34, 633 A.2d 867, 870–71 (1993); *see also State v. Robinson,* 336 N.C. 78, 443 S.E.2d 306, 317 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 750, 130 L.Ed.2d 650 (1995).

We find no abuse of discretion. The initial questions were tailored to inquire into a prospective juror's preconceptions regarding the death penalty and to reveal whether those preconceptions would be an obstacle to impartially sentencing the defendant given the facts and the law. The follow-up questions were sufficient to disclose any bias identified in the responses to the initial questions. Together, the questions were sufficient to identify a juror's state of mind concerning the death penalty and the juror's ability to evaluate the evidence impartially. *See Evans,* 333 Md. at 677, 637 A.2d at 125. We reiterate our observation in *Evans:* "It is unlikely that a juror who has no strong feelings about the death penalty will simultaneously vote for the death penalty regardless of the facts and circumstances of the case." *Id.* at 675, 637 A.2d at 124. We believe that the voir dire questions "[o]n their face ... were clearly sufficient ... to determine whether prospective jurors were death-penalty dogmatists," and thus, the voir dire satisfied the standard enunciated in *Morgan* and *Evans. Id.* Accordingly, we find that the post-conviction court did not err in denying relief on these grounds.

## II. Whether the trial court erred at the sentencing proceeding in failing to instruct the jury that it could consider as a non-statutory mitigating factor that appellant was serving a sentence of life without parole under Maine law?

Before this Court, Oken contends that he is entitled to a new sentencing hearing because the trial judge failed to instruct the jury that it could consider as a non-statutory mitigator under Art. 27, § 413(g)(8) that Petitioner previously had been sentenced to life imprisonment without parole in Maine for the Ward murder. Although his trial counsel did

not request an instruction that the jury could consider the Maine sentence as a non-statutory mitigator, he argues that the trial court should have *sua sponte* given the instruction. This is required, he continues, because the State argued future dangerousness in closing argument and in rebuttal closing, argued that the jury should ignore Oken's Maine sentence. Relying on *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), Oken asserts that the failure to give the instruction deprived him of due process of law.[7] The State argues that Oken was not entitled to such an instruction and that, even if he were, there was no prejudice.

We begin our analysis with the Supreme Court's recent decision in *Simmons.* The Supreme Court held that due process requires that if the State urges the imposition of the death penalty based on the defendant's future dangerousness, the jury should be informed, either by argument or instruction, that the defendant currently is parole ineligible or could be parole ineligible through imposition of the alternative sentence of life imprisonment without parole.[8] *Simmons,* 512

---

7. The Supreme Court decided *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), after the post-conviction hearing in these proceedings was concluded. Oken raised a similar contention before the post-conviction court. The post-conviction court rejected Oken's claim. Judge Levitz found:

> Judge Smith did instruct the jury that they could consider as a mitigating factor a Maryland life without parole sentence. Trial counsel made the tactical decision not to object to this instruction. It is clear, therefore, that Judge Smith had no duty to instruct the jury about the Maine sentence. Even if Judge Smith did have such a duty, the error would still not be grounds for relief as Petitioner was not prejudiced by the error. The jury was told they could consider life without parole as a mitigator and reject a sentence of death. This Court finds that this claim is not grounds for post-conviction relief.

8. In *Simmons,* "[t]hree times petitioner asked to inform the jury that in fact he was ineligible for parole under state law; three times his request was denied." 512 U.S. at ——, 114 S.Ct. at 2193, 129 L.Ed.2d at 141. The Court found that Simmons was denied due process because the death penalty was secured, in part, on the ground of future dangerousness, while concealing from the jury the meaning of its non-capital

U.S. at ——, 114 S.Ct. at 2196, 129 L.Ed.2d at 145–46; *Id.* at ——, 114 S.Ct. at 2199, 129 L.Ed.2d at 149 (Ginsburg, J., concurring); *Id.* at —— – ——, 114 S.Ct. at 2200–01, 129 L.Ed.2d at 150–51 (O'Connor, J., concurring). *Simmons* does not require that the jury learn of defendant's parole ineligibility through a jury instruction. *Id.* at ——, 114 S.Ct. at 2196, 129 L.Ed.2d at 145–46. Due process is met "if the relevant information is intelligently conveyed to the jury; due process does not dictate that the judge herself, rather than defense counsel, provide the instruction." *Id.* at ——, 114 S.Ct. at 2199, 129 L.Ed.2d at 145–46 (Ginsburg, J., concurring). Justice O'Connor, joined by the Chief Justice and Justice Kennedy, stated:

> I agree with the Court that [when the State seeks to show the defendant's future dangerousness] the defendant should be allowed to bring his parole ineligibility to the jury's attention—by way of argument by defense counsel or an instruction from the court—as a means of responding to the State's showing of future dangerousness.

*Id.* at —— – ——, 114 S.Ct. at 2200–01, 129 L.Ed.2d at 150–51 (O'Connor, J., concurring).

▪ We find that Oken's parole ineligibility was sufficiently presented to the jury through evidence and argument of counsel. Therefore, there was no *Simmons* violation. The pre-sentence investigation report, introduced by the State at the sentencing hearing, showed that Oken had been sentenced in Maine to life imprisonment without parole. *See* Maryland Code (1957, 1993 Repl. Vol., 1995 Supp.) Art. 41, § 4–609(c). Additionally, Mr. Lipsitz told the jury in his opening statement and closing argument that Oken was presently serving a sentence of life without parole in Maine. He said:

> The man is already in jail in a prison for the rest of his days, life without parole, and that means life without parole. He isn't going anywhere. If you found him not guilty—or

---

sentencing alternative that life imprisonment meant life without parole. *Id.* at ——, 114 S Ct. at 2198, 129 L.Ed.2d at 147.

had found him not guilty, he would go back to the state of Maine and spend the rest of his life in jail there.

So these are all—you might consider that as a mitigating factor under that Mitigating Factor No. 8.

■■■■■■ Moreover, we believe the trial court properly instructed the jury as to the meaning of life without parole and that life without the possibility of parole was an available alternative sentence. Jury instructions are sufficient if they fully and fairly cover the law. *See* Rule 4–325(c). The court instructed the jury that it could consider Oken's parole eligibility as a mitigating factor:

Steven Oken's parole eligibility, should he receive a sentence of life imprisonment or life imprisonment without the possibility of parole, may be taken into account by you in your consideration of mitigating circumstances as well as in your determination of whether the appropriate sentence is death or life imprisonment.

The trial court then explained the seven statutory mitigators and explained to the jury that non-statutory mitigators were "every other mitigating circumstance or circumstances that any one of you may find not covered by [the statutory mitigators]."[9] Finally, the court defined the meaning of life imprisonment and life imprisonment without parole:

If Life Imprisonment is entered in Section V, you must then proceed to Section VI. If you unanimously find that the sentence of life imprisonment should be without the

---

9. Under Maryland Code (1957, 1992 Repl. Vol., 1994 Cum.Supp.) Art. 27, Section 413(g), the seven statutory mitigators are: 1) the defendant has not previously been convicted of a crime of violence; 2) the victim was a participant in the defendant's conduct or consented to the act which caused her death; 3) the defendant acted under substantial duress, domination or provocation of another person insufficient to constitute a complete defense to prosecution; 4) the defendant was not criminally responsible for his actions because of some mental disorder, mental incapacity, or emotional disturbance; 5) the youthful age of the defendant at the time of the crime; 6) the act of the defendant was not the sole proximate cause of the victim's death; and 7) it is unlikely that the defendant would engage in further criminal activity that would constitute a continuing threat to society.

possibility of parole, mark "Yes" in the space provided. If you unanimously find that the sentence of life imprisonment should be with the possibility of parole, mark "No" in the space provided.

If you sentence Steven Oken to life imprisonment without the possibility of parole, he will never be eligible for parole and will not be granted parole for the balance of his natural life. If you sentence the defendant to life imprisonment, he will not be eligible for parole considerations until he has served 25 years or the equal of 25 years less such time credits as are earned by him for good behavior, exceptional industry, or the like. Additionally, in the event that at some future date the Parole Commission recommended that Steven Oken be released on parole, he could only be paroled if that decision was specifically approved by the Governor of Maryland.

In addition, during jury deliberations, the jury sent a note to the trial judge, asking the following question: [10]

If the jury convicts "life w/o parole" is their [sic] any possibility *at all* that Oken could be released?

After consultation with counsel in Oken's presence, the trial court responded

There is no possibility that the Defendant could be released on parole if the sentence is life w/o parole.

Petitioner was not prevented from bringing to the jury's attention information that would rebut or explain the showing of future dangerousness. The trial judge specifically instructed the jurors that they could sentence Oken to life without the possibility of parole and if they did so, Oken would remain in prison for the remainder of his natural life. Finally, the trial judge, with Oken's personal approval, responded to the jury inquiry during deliberations that if sentenced to life without

10. The note contained two inquiries. The second question read: "Could there be a law passed in the future to allow Oken out?" The judge responded, "Such speculation should play no part at all in your discussions as to the sentence in this case."

the possibility of parole, Oken would never be released from prison.

We conclude that this jury was adequately informed that life imprisonment for Oken meant that he would never be released from prison by parole. Moreover, this jury was adequately informed that Oken was currently serving a life sentence without parole in Maine. The jury was certainly given the opportunity to find that life imprisonment was an acceptable alternative to the death penalty. *Cf. Hunt v. State,* 321 Md. 387, 404, 583 A.2d 218, 226 (1990), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991). There is no due process violation.[11] Accordingly, we find no error.

### III. Whether the Petitioner's trial counsel provided ineffective assistance of counsel?

Oken asserts numerous grounds to support his claim that he received ineffective assistance of counsel at his trial. Judge Levitz reorganized these claims into six categories: (1) failure to show sufficient evidence of Oken's drug and alcohol abuse; (2) failure to adequately prepare Oken's expert witnesses; (3) inadequate presentation of Oken's Maine life sentence as a mitigating factor; (4) failure to object to the State's closing arguments; (5) erroneous advice concerning Oken's *Alford* plea in Maine;[12] and (6) the cumulative effect of errors.

---

11. We are uncertain whether Oken is also arguing that the Maine life sentence should have been listed on the sentencing form as a potentially mitigating factor. To the extent that he asserts this issue, the claim is meritless. This Court held in *Booth v. State,* 327 Md. 142, 161–62, 608 A.2d 162, 171, *cert. denied,* 506 U.S. 988, 113 S.Ct. 500, 121 L.Ed.2d 437 (1992), that a defendant "does not have a right to have listed on the sentencing form furnished to the jury nonstatutory issues of a potentially mitigating nature that have been generated by the evidence."

12. In *Pennington v. State,* 308 Md. 727, 728 n. 1, 521 A.2d 1216, 1216 n. 1, (1987) we defined an "Alford" plea as a "guilty plea containing a protestation of innocence." *See North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). *See also* Maryland Rule 4–242(c) (court may accept plea of guilty even though defendant does not admit guilt).

■ In reviewing Oken's claim, we apply the test for assessing the adequacy of counsel's performance enunciated by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to establish a claim of ineffective assistance of counsel, the burden is on the petitioner to prove that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Williams v. State,* 326 Md. 367, 373, 605 A.2d 103, 106 (1992); *see also Gilliam v. State,* 331 Md. 651, 665–66, 629 A.2d 685, 692 (1993), *cert. denied,* 510 U.S. 1077, 114 S.Ct. 891, 127 L.Ed.2d 84 (1994) (*Gilliam II* ).

■ To establish that a deficiency existed, Oken must demonstrate that his counsel's acts or omissions were the result of unreasonable professional judgment and that counsel's performance, given all the circumstances, fell below an objective standard of reasonableness considering prevailing professional norms. *Strickland,* 466 U.S. at 686–88, 104 S.Ct. at 2064, 80 L.Ed.2d at 693; *Gilliam II,* 331 Md. at 665, 629 A.2d at 692; *State v. Thomas,* 328 Md. 541, 556, 616 A.2d 365, 373 (1992), *cert. denied,* 508 U.S. 917, 113 S.Ct. 2359, 124 L.Ed.2d 266 (1993) (*Thomas III* ); *State v. Tichnell,* 306 Md. 428, 441, 509 A.2d 1179, 1185, *cert. denied,* 479 U.S. 995, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986); *Harris v. State,* 303 Md. 685, 496 A.2d 1074 (1985). Oken must also overcome the presumption that the challenged action might, under the circumstances, be considered sound trial strategy. *Gilliam II,* 331 Md. at 666, 629 A.2d at 692. In *State v. Thomas,* 325 Md. 160, 171, 599 A.2d 1171, 1176 (1992) (*Thomas II* ), we addressed the deferential view that *Strickland* affords to counsel's performance:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hind-

sight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

(quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–95) (citations omitted).

Petitioner must also show that counsel's performance prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Oken must demonstrate " 'that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable.' " *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 842, 122 L.Ed.2d 180, 189 (1993) (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693); *Nix v. Whiteside,* 475 U.S. 157, 165, 106 S.Ct. 988, 993, 89 L.Ed.2d 123, 133 (1986). In order to establish prejudice, Oken must show that there is a substantial possibility that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Williams,* 326 Md. at 374–76, 605 A.2d at 106–07; *Bowers v. State,* 320 Md. 416, 425–27, 578 A.2d 734, 738–39 (1990). A proper analysis of prejudice, however, should not focus solely on an outcome determination, but should consider "whether the result of the proceeding was fundamentally unfair or unreliable." *Fretwell,* 506 U.S. at 369, 113 S.Ct. at 842, 122 L.Ed.2d at 189.

In evaluating Oken's claim, we need not approach the inquiry in any particular order, nor are we required in every instance to address both components of the *Strickland* test. The Supreme Court commented that

[t]he object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

prejudice, which we expect will often be so, that course should be followed.

466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699. We shall address Oken's allegations within this framework and make our own independent analysis.

### A. Evidence of Substance Abuse

Oken contends that his counsel should have investigated and presented readily available evidence of substance abuse at the guilt/innocence stage and the sentencing stage of his trial. He claims that this evidence could have convinced the jury to convict him of second degree murder, thereby making him ineligible for the death penalty. *See* Art. 27, § 412(d). Alternatively, he argues that this evidence would have been a possible mitigating factor for sentencing. He argues that counsel's failure to interview four lay witnesses and to perform radioimmunoassay of hair samples collected by the Maine police fell below an objective standard of reasonableness.[13]

Before the post-conviction court, Oken asserted that his trial counsel put on virtually no evidence to prove Petitioner's longstanding alcohol and drug abuse. At the post-conviction hearing, he called four lay witnesses who each testified that they lived in the Baltimore area, that they were never contacted by Petitioner's trial counsel before trial, and that they each possessed personal knowledge of Oken's serious drug abuse before the Garvin murder. He attributes the alleged omission to call these witnesses to oversight and neglect. The State contends that trial counsel presented sufficient evidence of

---

13. The testing procedure is known as radioimmunoassay. Some courts have approved the use of radioimmunoassay of hair samples to demonstrate habitual drug usage. *See e.g., United States v. Medina,* 749 F.Supp. 59 (E.D.N.Y.1990) (approving the admissibility of hair sample tests to determine if defendant had ingested narcotics in violation of the conditions of his parole); *Burgel v. Burgel,* 141 A.D.2d 215, 533 N.Y.S.2d 735 (1988) (approving decision to allow test to confirm habitual drug use during discovery phase of civil custody dispute). This Court, however, has not yet addressed the admissibility of radioimmunoassay under *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978). We do not today decide whether the evidence is admissible in Maryland.

Oken's history of substance abuse and was, therefore, not ineffective. In addition, the State asserts that this evidence would have been merely cumulative.

The post-conviction court found that counsel's failure to develop additional evidence of drug or alcohol abuse at either stage of the proceedings was not deficient under *Strickland.* With respect to counsel's performance during the guilt/innocence phase, Judge Levitz stated:

> [C]ounsel may very well have decided that Petitioner's defense would not have benefitted by a voluntary intoxication issue. The jury, for example, may very well have been angered by the fact that Petitioner was selling drugs from the family pharmacy to support his own habit. This coupled with the fact that Petitioner was claiming to have amnesia for the time which the murders occurred make counsel's decision appear to be a reasonable one.

Similarly, with respect to counsel's performance during the sentencing phase, Judge Levitz found that "[t]he decision of whether to pursue the drug abuse defense is a tactical decision and counsel may very well have believed that this evidence would have angered the jury."

We think that Mr. Lipsitz' presentation of the voluntary intoxication defense was essentially a tactical choice within the realm of reasonable assistance of counsel. The decision on how best to present a defense is a tactical one.[14]

---

**14.** At the post-conviction hearing, Mr. Lipsitz summarized his defense strategies. He testified:

> First of all, there was an insanity defense which was running. Secondly, I was interested in trying to beat the sexual offense count and the burglary count. Thirdly, there was a substance abuse defense. Fourthly, there was a defense of, can you find a hole in the State's case that might give you some leeway. General defenses.

He further testified that with respect to the substance abuse defense:

> In my opinion in this case under all the facts the substance abuse defense wouldn't have gone anywhere....
>
> I mean, if you are talking about my proving the extent of his substance abuse, I don't think that would have succeeded, although I did what I could in that area.

*See Hunt v. Smith,* 856 F.Supp. 251, 257 (D.Md.1994), *aff'd sub nom., Hunt v. Nuth,* 57 F.3d 1327 (4th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 724, 133 L.Ed.2d 676 (1996). Mr. Lipsitz' failure to present the additional evidence did not rise to the level of deficient performance. *Tichnell,* 306 Md. at 456–57, 509 A.2d at 1193–94.

We have made our own independent review of the record and find that the jury heard substantial evidence of substance abuse. This evidence was presented through the testimony of Oken's ex-wife, father, mother, acquaintances, and the three medical witnesses, Dr. Berlin, Dr. Payson, and Dr. Spodak.[15]

Moreover, the evidence would have been cumulative. *Gilliam II,* 331 Md. at 678–80, 629 A.2d at 699–700 (rejecting claim of ineffective assistance of counsel where evidence not

---

We note that until the time of trial Oken claimed to be suffering from amnesia that prevented him from recalling events from the time period surrounding the Garvin murder. We agree with Judge Levitz that counsel's decisions regarding presentation of the voluntary intoxication defense were reasonable in light of Oken's claimed amnesia.

**15.** For example, Oken's mother testified for the defense at both the guilt/innocence and sentencing phases that Oken had begun using alcohol and cocaine at an early age and that Oken admitted to her that he had used Xanex that he had taken from the family pharmacy. She also testified at the guilt/innocence phase that Oken's behavior in October 1987 was erratic, that she sometimes noticed alcohol on his breath, and that on one occasion Oken reeked of alcohol when he opened the pharmacy in 1987. On another occasion she found Oken with pills. Oken's father testified at the guilt/innocence phase that Oken was acting erratically during October 1987, that it was obvious to him that Oken had a substance abuse problem, and that a substantial quantity of Xanex had been found missing from the family pharmacy in the Spring of 1987. Drs. Payson, Berlin, and Spodak each testified at the sentencing phase that Oken had a substance abuse problem. Oken's ex-wife testified during the guilt/innocence phase that Oken was drinking heavily during October 1987, that she found pills in a pair of his pants and another vial of pills in his nightstand, that on at least one occasion in September or October 1987 she drove Oken home because he seemed intoxicated, and that she had disposed of a case of wine and a vial of pills to prevent Oken from using these substances.

Xanex is a trade name for benzodiazepine. Oken contends that radioimmunoassay would have shown the presence of benzodiazepine. Since the jury heard evidence of Oken's abuse of Xanex, the testing would have been cumulative.

presented was cumulative); *see also Proctor v. United States,* 729 F.Supp. 473, 476 (D.Md.) (rejecting ineffective assistance of counsel claim where evidence would have been merely cumulative, notwithstanding defendant's claim that evidence was 'vital'), *aff'd sub. nom., Epps v. United States,* 911 F.2d 721 (4th Cir.1990), *cert. denied,* 498 U.S. 1038, 111 S.Ct. 707, 112 L.Ed.2d 697 (1991). Counsel's failure to present this cumulative evidence does not satisfy either prong of the *Strickland* test. Accordingly, we find that the post-conviction court did not err in denying relief on these grounds.

## B. Preparation of the Experts

 Oken contends that the failure of his counsel to adequately prepare two defense psychiatrists for their testimony at the sentencing hearing rises to the level of ineffective assistance. At sentencing, Oken's counsel presented the testimony of Dr. Berlin and Dr. Payson to establish that Oken suffered from sexual sadism. He hoped to persuade the jury that sexual sadism, a mental disorder listed in Diagnostic and Statistical Manual of Mental Disorders (3d Ed.Rev.) (DSM III–R),[16] would mitigate against imposing the death penalty.

As part of the factual predicate for his diagnosis, Dr. Berlin testified that Oken raped and killed his sister-in-law, Patricia Hirt, about two weeks after the rape and murder of Dawn Garvin. In addition, both doctors testified that Oken's sexual sadism was an incurable and untreatable disorder. Oken argues that this highly prejudicial testimony portrayed him as an "incurably violent man" and should not have been presented to the jury. His counsel, he claims, was ineffective in failing to instruct the doctors to avoid mentioning this aspect

---

16. Sexual Sadism is defined in the Diagnostic and Statistical Manual of Mental Disorders (3d Ed. Rev.) at § 302.84. The disorder is characterized by

recurrent, intense, sexual urges and sexually arousing fantasies, of at least six months' duration, involving acts (real, not simulated) in which the psychological or physical suffering (including humiliation) of the victim is sexually exciting. The person has acted on these urges, or is markedly distressed by them.

of the disease. He asserts that there is nothing improper in instructing expert witnesses to avoid mentioning prejudicial evidence on direct examination. Oken also asserts that during the cross-examination of the State's expert, Dr. Spodak, Mr. Lipsitz compounded his error by mentioning that Oken left Maryland because of "another substantial event which occurred," a clear reference to the Hirt murder.

Counsel's strategy was to present evidence of a mental disorder as a mitigating circumstance through the testimony of Dr. Berlin and Dr. Payson, even though the basis for the diagnosis included the Hirt murder. At the post-conviction hearing, Mr. Lipsitz explained his strategy:

> Because one of the defenses was a diagnosis of sexual sadism, that information might be to reenforce that allegation and persuade somebody that he really was sick.

Mr. Lipsitz also testified that his strategy was to demonstrate that Oken would not be dangerous in the future: "I was hoping to establish that he was innocuous as possible, of course.... I was trying to prove, if I could, that he won't be a danger in the future."

The post-conviction court found that Mr. Lipsitz' preparation of Dr. Berlin and Dr. Payson did not constitute ineffective assistance of counsel. With respect to the Hirt murder, Judge Levitz stated:

> [t]his Court does not believe that counsel's failure to instruct Dr. Berlin to withhold an important part of his factual basis supporting his medical diagnosis can in any way be construed as deficient. It was, of course, sound trial strategy for the defense to submit evidence of a mental disorder as this is a mitigating factor under the Maryland death penalty statute. The downside to this tactic in this case was that the basis of the mental disorder was Petitioner's past homicides. A diagnosis without a basis would have little weight with a jury. Furthermore, it would have been improper for counsel to instruct Dr. Berlin to withhold part of his factual basis simply because it hurt Petitioner's case.

With respect to the future dangerousness testimony, Judge Levitz found:

> Petitioner's third claim regarding counsel's performance during sentencing is that counsel was ineffective by failing to properly prepare Drs. Henry Payson and Fred Berlin on the issue of future dangerousness and Petitioner's long-term recovery prospects. Both doctors testified that Petitioner was suffering from "sexual sadism" and that there was no cure or treatment for this disorder. Petitioner argues that this portrayed him as an incurably violent man and severely prejudiced his case. This Court does not believe this claim is grounds for post-conviction relief. Counsel made the decision to put on evidence of the mental disorder and the doctors properly explained their understanding of this disorder. This disorder would be more persuasive if it was fully explained to the jury. Moreover, counsel's failure to instruct the doctors to withhold this evidence cannot be considered deficient as any instruction to do so would be considered improper.

Judge Levitz also found that because there was no error in allowing Dr. Berlin to discuss the Hirt homicide, there was no error to compound when counsel referred to the Hirt murder during his cross-examination.

We agree with Judge Levitz that trial counsel made the tactical decision to present the factual basis for the medical diagnosis. At the post-conviction hearing, Oken's legal expert testified that this "[c]ase seems to cry out for some sort of medical explanation as to why these crimes occurred." He stated that "once they went down that track of sexual sadism, I think they were kind of stuck with the Hirt homicide." Considering the diagnostic criteria for sexual sadism, we cannot say that this strategy was unsound. Through the psychiatric testimony, Mr. Lipsitz succeeded in convincing at least one juror, if not more, that Oken's mental disorder was a mitigating factor.

Counsel's failure to "sanitize" the testimony was not deficient. *See Gilliam II*, 331 Md. at 669, 629 A.2d at 694;

*State v. Earp,* 319 Md. 156, 170–72, 571 A.2d 1227, 1234–35 (1990) (cautioning counsel to avoid suggesting testimony to the witness.) Mr. Lipsitz testified that he made the tactical decision to elicit testimony from the experts in order to establish Oken's lack of future dangerousness. Mr. Lipsitz testified that he prepared Dr. Berlin before trial and that he was generally familiar with what the testimony would cover. Moreover, Dr. Berlin testified at the trial, in response to Mr. Lipsitz' question, that "I told you when you asked me to testify, I am going to call it like I see it."

Petitioner is correct that the proponent of expert testimony is not required to elicit *all* the facts upon which the opinion is based; nevertheless, the factual basis for the expert's opinion is admissible to enable the jury to properly weigh the testimony. *Simmons v. State,* 313 Md. 33, 42–43, 542 A.2d 1258, 1262–63 (1988); *see also Department v. Bo Peep,* 317 Md. 573, 589, 565 A.2d 1015, 1023 (1989). Clearly, Mr. Lipsitz thought the factual basis for Dr. Berlin's diagnosis might have been helpful to Oken.[17] We will not second guess his decision. *Gilliam II,* 331 Md. at 666, 629 A.2d at 692. Petitioner's claim that Mr. Lipsitz failed to adequately prepare the experts is without merit. Counsel's performance was not deficient. Accordingly, we find no error.

### C. Maine Life Sentence

Oken contends that his counsel failed to adequately demonstrate to the sentencing jury that his sentence of life without the possibility of parole for the Maine homicide mitigated against imposition of the death penalty. We have previously addressed this argument in section II; Oken now recasts this claim in terms of ineffective assistance of counsel.

The post-conviction court found that Mr. Lipsitz' representation was neither deficient nor prejudicial to Oken:

---

17. At the post-conviction hearing, Mr. Lipsitz testified "I think there was a basis for what Dr. Berlin said, which might have been helpful to Mr. Oken."

´[C]ounsel did explain to the jury that Petitioner's sentence in Maine was life without the possibility of parole making the jury aware of this fact. More importantly, there is no way Petitioner can show he was prejudiced by counsel's failure to put on proof regarding the Maine sentence. Judge Smith explained to the jury during his instructions that the jury could consider as a mitigating factor the fact that if Petitioner received life imprisonment without the possibility of parole, he will never be released during his natural life. The jury was aware that they could reject a death sentence and keep Petitioner incarcerated for the rest of his life.

\* \* \* \* \* \*

Judge Smith instructed the jury that they could consider as a mitigating factor a life sentence "should he [Petitioner] receive a life or life without parole." . . . The jury was aware that they could reject a death sentence and keep Petitioner in jail for the rest of his life. They decided, nonetheless, that Petitioner should receive a death penalty rather than life without parole. It is clear, therefore, that there is not a significant possibility that if the jury had been instructed on the Maine sentence the result would be any different.

We agree. Accordingly, we find no error in the post-conviction court's denial of relief on this ground.

### D. The State's Closing Arguments

Oken next contends that his trial counsel should have objected to certain remarks made by the prosecutor during closing argument at both the guilt/innocence and sentencing phases of the trial. Counsel did not object to the prosecutor's comments referring to Oken's demeanor, the prosecutor's comments that Oken now claims infringed on his right to remain silent, nor to the "State's Persian Gulf War/Patriotic Duty" speech.

Oken's first claim is that the prosecutor improperly commented about his demeanor. We addressed these comments

in *Oken I* and held that these statements were not improper and were not plain error. 327 Md. at 674–77, 612 A.2d at 280–82. Oken now couches his argument in terms of ineffective assistance of counsel and urges a different result when considered in this context.[18]

Oken next contends that portions of the prosecutor's opening and closing remarks constituted impermissible comments on his right to remain silent. He argues that the prosecutor's statements that "the defendant said some things through his attorney in opening" and that Mr. Lipsitz "really doesn't dispute these items" were in derogation of his right to remain silent.

Finally, Oken contends that his counsel was ineffective in failing to object when the prosecutor told the jury in closing argument:

I find it ironic that during the course of this lengthy, difficult and painful trial our country went to war, right in the middle of it, and we saw every night other people making personal sacrifices of this nature so that we can live in a fair and just and hopefully a safe society. And that's what you all have also been asked to do, make that kind of a personal sacrifice to keep our country and our community the way it is and the way it should be.

Oken asserts that these comments, by drawing an analogy between the jury's role in Oken's trial and the role of U.S. soldiers in the Persian Gulf War, improperly urged the jury to take his life to keep our community the way it should be, just as our soldiers were doing in Iraq. This argument, he contin-

---

18. He suggests that he was prejudiced by counsel's failure to object because on direct appeal an error objected to below is reviewed on an abuse of discretion standard, whereas, if no objection is made in a capital case, reversal is only required where it appears that the remarks of the prosecutor actually misled the jury or where likely to have misled or influenced the jury to the prejudice of the accused. *Booth*, 327 Md. at 193, 608 A.2d at 187. Because trial counsel did not object, he continues, the demeanor error was reviewed under the more stringent standard. We need not engage in a discussion of the different standard of review because the result is the same under either standard.

ues, substitutes passion, emotion and patriotism for reasoned judgment, thereby shifting the jury's focus away from the facts of the case. Oken concludes that trial counsel should have objected to the prosecutor's statements, that counsel's failure to object was not reasonable and that there is a significant possibility that but for this unprofessional performance, the result of the proceedings would have been different.

At the post-conviction hearing, Oken's counsel testified that his reasons for not objecting to the prosecutor's comments were tactical. He explained that he did not believe that objecting would make a difference, that the jury knew he did not agree with the State, that he chose not to highlight the comments, and that he decided not to object to avoid antagonizing the jury.

Judge Levitz rejected Oken's arguments and found that counsel's failure to object did not constitute ineffective assistance. Judge Levitz noted that objections at trial, and especially during closing argument, are tactical decisions best left to the discretion of trial counsel. In addition, relying on our opinion in *Oken I*, he found that the prosecutor's statements about Oken's demeanor were not improper, and therefore, Petitioner suffered no prejudice.[19] We agree. Because the prosecutor's comments were not improper, *a fortiori* Oken was not prejudiced. *Cf. State v. Colvin,* 314 Md. 1, 22, 548 A.2d 506, 516 (1988).

---

**19.** In *Oken I,* 327 Md. at 677, 612 A.2d at 282, finding no cause to reverse, we stated that

the jurors observed Oken throughout the course of the trial, and were free to reach their own independent conclusions regarding his demeanor. The jurors were also instructed by the trial judge that the opening and closing arguments of counsel were not to be considered as evidence. Moreover, the record reflects that the evidence presented in this case fairly supported the prosecutor's remarks concerning Oken's demeanor.

In addition, we note that the comment, when viewed in context of the prosecutor's closing argument, could reasonably be interpreted as the State's response to Oken's written allocution that was read to the jury wherein he professed remorse.

 We also agree with Judge Levitz that Oken's counsel was not ineffective in failing to object to the comments Oken claims infringed on his right to remain silent. We find that neither of the statements were a comment upon the failure of Petitioner to testify, nor did these statements violate Petitioner's right to a fair trial. To be sure, comments on a defendant's failure to testify violate the defendant's constitutional rights. *See Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106, 110 (1965); *Woodson v. State*, 325 Md. 251, 265, 600 A.2d 420, 426 (1992). Reading the prosecutor's closing argument in context, however, we do not believe the statements were comments on Petitioner's right to remain silent. *See King v. State*, 190 Md. 361, 373–74, 58 A.2d 663, 668 (1948) (holding that statement that there was no evidence to refute the State's case was not improper comment on defendant's failure to testify); *State v. Ward*, 338 N.C. 64, 449 S.E.2d 709, 729 (1994) (holding prosecutor's remarks were not a comment on defendant's failure to testify, but fair and proper comments on defendant's failure to present any evidence), *cert. denied*, —— U.S. ——, 115 S.Ct. 2014, 131 L.Ed.2d 1013 (1995); *see also Eastman v. State*, 47 Md.App. 162, 167, 422 A.2d 41, 43–44 (1980). Nor do we find that the jury would naturally interpret the State's argument as a comment on Petitioner's failure to testify. Accordingly, we find that neither of the prosecutor's statements were improper, nor did they violate Petitioner's right to a fair trial.

 Finally, we find trial counsel's failure to object to the prosecutor's Persian Gulf War comments was not constitutionally deficient. The decision to interpose objections during trial is one of tactics and trial strategy. *Colvin*, 314 Md. at 22, 548 A.2d at 516; *see Evans v. Thompson*, 881 F.2d 117, 125 (4th Cir.1989), *cert. denied*, 497 U.S. 1010, 110 S.Ct. 3255, 111 L.Ed.2d 764 (1990). Counsel's failure to object was clearly a tactical decision within the range of reasonably competent representation. For the reasons stated above, we find no reversible error in counsel's failure to object to the prosecutor's remarks.

## E. The Guilty Plea in Maine

Oken next claims that he entered the *Alford* plea in Maine based on erroneous legal advice that he received from Mr. Lipsitz.[20] He claims that Mr. Lipsitz told him that the plea could not be used against him in any manner in the Maryland prosecution. He also claims that Mr. Lipsitz told him that under the Interstate Agreement on Detainers ("IAD") he would have to serve the Maine sentence of life without parole before any Maryland sentence could be satisfied.

Oken identifies two consequences of Mr. Lipsitz' advice that he alleges prejudiced his defense. Contrary to Oken's expectations, the Governors of Maryland and Maine entered into an executive agreement providing that if the Maryland sentence was less than life without parole, Oken would be returned to Maine within a reasonable period of time following the conclusion of the Maryland proceedings.[21] In addition, during the

---

**20.** Prior to the Garvin prosecution in Maryland, Oken was represented by Mr. Lipsitz in the Maine prosecution. *See State v. Oken*, 569 A.2d 1218 (Me.), *cert. denied*, 498 U.S. 818, 111 S.Ct. 62, 112 L.Ed.2d 36 (1990). On April 21, 1989, Oken entered a conditional guilty plea pursuant to Maine Rule of Criminal Procedure 11(a)(2). The plea was offered as an *Alford* plea.

**21.** At the hearing on Oken's Motion to Dismiss the charges, the State's Attorney read portions of the agreement into the record. The agreement reads in pertinent part:

In the event that Steven Howard Oken is acquitted in the Courts of the State of Maryland or the prosecution in the State of Maryland is concluded or terminated for any reason but not limited to

 a. The Defendant is found to be not competent to stand trial; or
 b. The Defendant is found not criminally responsible; or
 c. The Defendant is found Guilty and receives a sentence for Life or a term of incarceration of less than Life; or
 d. Any conviction of Steven Howard Oken is pardoned by the Executive Authority of Maryland; or
 e. Any sentence imposed on Steven Howard Oken is commuted to a term of years of less than Life Without Parole;

then the said Steven Howard Oken shall thereafter be returned at the earliest reasonable time to the State of Maine.

The trial judge denied the Motion to Dismiss, finding that Maryland Code (1957, 1993 Repl. Vol., 1995 Supp.) Art. 41, § 2–205 does not preclude the Governor of Maine and the Governor of Maryland from entering into such an agreement.

penalty phase in the Maryland proceeding, the State introduced evidence of the Maine conviction. Oken contends that his guilty plea to a crime of violence in Maine deprived him of a statutory mitigator at his death penalty sentencing in Maryland and he is therefore entitled to a new sentencing hearing. *See* Art. 27, § 413(g)(1).

The post-conviction court made the following findings:

Petitioner's own expert admitted the case against Petitioner in Maine was overwhelming. Based on this fact, counsel advised Petitioner to enter the *Alford* plea with the hope that an argument could be made during the Dawn Garvin proceedings that this plea was inadmissible. Despite these efforts, the plea was found to be admissible and was entered into evidence during the Dawn Garvin proceedings. The fact that the plea was admitted, however, does not make counsel's advice deficient. Faced with an overwhelming case in Maine, the advice to enter an *Alford* plea was reasonable despite its ultimate admission in the Dawn Garvin proceedings. While it is true that an *Alford* plea is the functional equivalent of a guilty plea, it was not certain that this plea would be admissible in the Dawn Garvin proceeding. Furthermore, counsel testified that he never promised Petitioner the plea would be inadmissible; he was only trying to manufacture as many arguments as possible. This particular argument failed, but it is the finding of this Court that the advice was not deficient.

Petitioner's second argument regarding the Maine case is that counsel erroneously advised him that, under the Interstate Agreement on Detainers (IAD), the Maine sentence would have to be served before any Maryland sentence. Since Maine had no death penalty statute, counsel believed this would insulate petitioner from a death sentence. As it turned out, however, the Governors of Maryland and Maine entered into an Executive Agreement which "trumped" the IAD by allowing Maryland to execute its sentence first. Counsel testified at the post conviction hearing that he believed this was a good argument to help Petitioner escape the death penalty but he never guaranteed this argument

would be successful. Although allowed by law, there was no way of knowing the Governors of the two states would enter into the agreement and counsel was simply trying every possibility to save his client from a death sentence. The fact of the matter is, counsel's advice regarding the *Alford* plea developed two arguments which could have saved Petitioner's life. This Court finds that not only was this advice in no way deficient, it was a good way to try to develop sound arguments in a very weak case.

Judge Levitz clearly rejected Oken's argument that he received ineffective assistance of counsel, finding no deficiency or prejudice under *Strickland.* In addition, his ruling was based on factual findings and an assessment of the credibility of the witnesses at the hearing.

At the post-conviction hearing, Mr. Lipsitz testified that he made no promises to Oken. He testified that he had the impression that there was a possibility that the State could not use an *Alford* plea in a death penalty proceeding. With respect to the IAD, he denied making any guarantees or promises to Oken. He recounted that he advised Oken that under the Interstate Agreement on Detainers, it was possible that Oken would have to be returned to Maine to serve his sentence before any Maryland sentence could be satisfied; although he was aware that the Governors could agree otherwise, he did not expect that they would do so in this case. Mr. Lipsitz testified that he was looking for ways to manufacture arguments on Oken's behalf because Oken was reluctant to go to trial: "My approach was I was looking for issues. I was looking for something to roll in front of a judge to give him a chance to make a mistake and stub his toe on."

Before the post-conviction court, the State introduced the transcript of the Maine guilty plea proceedings. In response to the *voir dire* at the time of the plea, Oken told the Maine court that his decision to enter a plea was unrelated to any

other prosecutions against him in other states.[22] The State argues that Oken's statements clearly indicate that Oken's plea was not predicated on the potential future effect on any Maryland proceedings. We agree with the State. While Oken can challenge his statements before the Maine court, these statements are strong evidence that his plea was unrelated to the Maryland proceedings. *See United States v. DeFusco,* 949 F.2d 114, 119 (4th Cir.1991), *cert. denied,* 503 U.S. 997, 112 S.Ct. 1703, 118 L.Ed.2d 412 (1992).

▮ Judge Levitz saw and heard the witnesses testify, and he assessed their credibility. Judge Levitz believed the testimony of trial counsel over that of Petitioner. He found that Mr. Lipsitz made no promises to Oken concerning the Maryland proceedings. We will not disturb these findings of the post-conviction court unless they are clearly erroneous. Maryland Rule 8–131(c); *see Thomas II,* 325 Md. at 177, 599 A.2d at 1179; *Tichnell,* 306 Md. at 442–43, 509 A.2d at 1186.

It is clear that Mr. Lipsitz' strategy was to give Oken the benefit of every possible defense that he could create. Judge Levitz' findings were not clearly erroneous.[23] We find that

---

**22.** The Maine transcript of the guilty plea proceedings reads, in pertinent part:

> THE COURT: Mr. Oken, you have heard what the Assistant Attorney General has stated here, that, one, this is an open plea. That means that there have been no negotiations as to the length of the plea. The plea can be anywhere from 25 years, on the murder charge, the sentence can be anywhere from 25 years to life, you understand that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And you understand what the Attorney General said in that regard?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And, secondly, that there may be prosecutions against you in other jurisdictions and that this plea has nothing to do with those prosecutions and the Attorney General's office is not going to in any way interfere with any other prosecutions in other jurisdictions, you understand that?
>
> THE DEFENDANT: Yes, sir.

**23.** Even if Judge Levitz had not made these fact findings, we are in no way indicating that there would have been grounds for post-conviction relief because Oken fails to satisfy the prejudice prong of *Strickland* —

the representation was not deficient. Accordingly, we find no error.

### F. Cumulative Effect of Errors

■■■ Oken contends that the cumulative effect of the errors alleged warrant the grant of a new trial and a new sentencing hearing. The post-conviction court denied Oken's claim that the cumulative effect of Mr. Lipsitz' errors warranted relief. Oken's allegations are not collectively more indicative of ineffective assistance of counsel than they are individually. *See Gilliam II*, 331 Md. at 686, 629 A.2d at 703. As we said in *Gilliam II*, the issue is one of simple mathematics: "twenty times nothing still equals nothing." *Id.* Accordingly, we find no error.

### IV. Whether the post-conviction court erred in not allowing Petitioner to obtain his own hair samples taken from him at the time of his arrest for purposes of conducting forensic tests to establish Petitioner's substance abuse at the time of the offense?

Oken contends that the post-conviction court erred in refusing to permit him to test hair samples for the presence of drugs. In his petition for post-conviction relief, Oken claimed that his counsel's failure to fully investigate and obtain evidence of Oken's substantial drug use constituted ineffective assistance of counsel. To support this claim and to establish the necessary prejudice prong under *Strickland*, Oken re-

---

that there would have been a substantial possibility of a different result. The transcript of the Maine proceeding indicates that the plea judge asked Oken on three separate occasions if his plea was voluntary; Oken's response was in the affirmative. Oken has not shown that there is a substantial possibility that but for the allegedly erroneous advice of Mr. Lipsitz, the result of the proceedings would have been different. *Williams v. State*, 326 Md. 367, 374–76, 605 A.2d 103, 106–07 (1992); *Bowers v. State*, 320 Md. 416, 425–27, 578 A.2d 734, 738–39 (1990).

He makes no suggestion that he was not guilty of the Maine charges or that if he had gone to trial in Maine, that he would have been found not guilty. The evidence in Maine was overwhelming. Had Oken gone to trial and been convicted, the result would have been the same; the conviction would have been admissible in Maryland.

quested permission to test the previously collected hair samples for the presence of drugs.

The State objected and argued that the forensic testing could not pinpoint when drug use occurred, the amount of drug use, nor the effect the drug use had on the user. At best, the State argued, the forensic evidence was cumulative and would only potentially corroborate evidence of drug abuse already provided through the testimony of family members and expert witnesses. Judge Levitz denied Oken's motion, stating: "I feel that the motion is inappropriate. It's not proper. It's not proper for a post-conviction proceeding and accordingly, the motion is denied."

Before this Court, Oken contends that the post-conviction court erred for two reasons. First, Oken suggests that the State misrepresented the reliability and capabilities of radioimmunoassay. He concludes that because the post-conviction court relied on misinformation provided by the prosecutor, the ruling was based on inaccurate information. Second, Oken asserts the court deprived him of his right to establish prejudice to his defense resulting from his counsel's deficient representation. We disagree.

Judge Levitz did not appear to rely upon the prosecutor's argument as a basis for his ruling. The discretion to exclude unnecessary and cumulative evidence is within the sound discretion of the post-conviction court. *See Ali v. State,* 314 Md. 295, 307, 550 A.2d 925, 931 (1988); *Drug Fair v. Smith,* 263 Md. 341, 354–55, 283 A.2d 392, 400 (1971). We find no abuse of discretion.

### V. Whether the trial court erred in allowing the jury to use the underlying felony murder as an aggravator in the penalty phase of the trial?

Oken contends that the trial court erred in allowing the State to use his first degree sex offense conviction as both an element of the felony murder and as an aggravator during the penalty phase. Oken failed to raise this issue on direct appeal and he has waived this claim. Art. 27, § 645A(c); Maryland Rule 8–131; *State v. Calhoun,* 306 Md. 692, 709,

716, 718, 511 A.2d 461, 469, 473, 474 (1986), *cert. denied,* 480 U.S. 910, 107 S.Ct. 1339, 94 L.Ed.2d 528 (1987) (*Calhoun II* ).

■ Furthermore, we considered and rejected this argument in *Stebbing v. State,* 299 Md. 331, 358–60, 473 A.2d 903, 916–17, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984). *See also Whittlesey v. State,* 340 Md. 30, 82–83, 665 A.2d 223, 249 (1995), *cert. denied,* —— U.S.· ——, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996); *Calhoun v. State,* 297 Md. 563, 629, 468 A.2d 45, 77 (1983), *cert. denied sub nom. Tichnell v. Maryland,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984) (*Calhoun I* ). A felony may serve as both the basis of a felony murder conviction and as an aggravator under the Maryland death penalty statute. In *Stebbing,* we reasoned that "Art. 27, §§ 412–414, makes plain the legislative intent that the commission of certain felonies, underlying a felony murder conviction, is to be considered an aggravating circumstance in the capital sentencing proceeding." 299 Md. at 359, 473 A.2d at 917. Oken has not presented us with any persuasive reason to reconsider the issue and we decline to do so. Accordingly, we find no error.

**VI. Whether the trial court erred in failing to instruct the jury that under Art. 27, § 413(g)(8), the "catch-all provision," it could list as a mitigating factor its desire to extend mercy.**

■ Oken contends that the trial court erred by not instructing the jury that it was permissible to use the catchall provision of Art. 27, § 413(g)(8) to express as a non-statutory mitigator the desire of any juror to extend mercy. He did not request this instruction at trial and he did not raise this issue on direct appeal. The issue is waived. Art. 27, § 645A(c); Maryland Rule 8–131; *Tichnell,* 306 Md. at 467, 509 A.2d at 1199; *see also Foster, Evans and Huffington v. State,* 305 Md. 306, 503 A.2d 1326 (1986), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986).

■ Even if this claim· was not waived, the failure to give this instruction was not error. The trial court was not required to instruct the jury to consider specific non-statutory

mitigating circumstances. *Booth v. State*, 327 Md. 142, 161–64, 608 A.2d 162, 171–72 (1992).

 Furthermore, Oken's claim lacks merit. We find that the trial court clearly informed the jury it could consider mercy as a mitigating factor. The jury was instructed that

[f]or purposes of this sentencing proceeding, a mitigating circumstance is anything about the defendant or about the facts of this case that, in fairness or in mercy, may make the death sentence an inappropriate penalty for this defendant.

A mitigating circumstance is, simply put, any fact which may cause any of you to conclude that the death penalty is not appropriate in this case.

The jury was also instructed that they could consider mercy. They were told as follows:

In determining whether death is the appropriate sentence, it is proper for you to exercise your own moral, factual and legal judgment in deciding whether the aggravating circumstance you may have found is sufficient in your minds to call for the punishment of death. You may decide that the aggravating factor proved by the State is not a sufficient reason to impose a death sentence and on that basis alone decide to impose a life sentence. Nothing in the law forbids you from extending mercy out of the belief that life imprisonment is sufficient punishment under all of the circumstances.

The jury was adequately informed that it could impose a life sentence based solely on a desire to extend mercy. *See Scott v. State*, 310 Md. 277, 289, 529 A.2d 340, 346 (1987) (the catch-all provision of Art. 27, § 413(g)(8) permits jury to extend mercy). In fact, Oken received more than he was entitled to receive. We stated in *Grandison v. State*, 305 Md. 685, 757, 506 A.2d 580, 616, *cert. denied*, 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986), that it was not error for a trial court to refuse to give an identical instruction:

To have instructed the jury as Grandison requested would have negated the carefully thought out sentencing procedure designed to meet the constitutional requirements set

forth by the Supreme Court by injecting the risk of arbitrary and capricious action into the proceeding.

For the reasons given above, the petition for post-conviction relief was properly denied.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED.*

BELL, Judge, dissenting.

The majority holds that the appellant has waived the right to raise, on post-conviction, the issue of the trial court's refusal to ask the *venire,* on its *voir dire,* questions sufficient to uncover the prospective jurors' attitudes about the death penalty. This is so, it reasons, because the appellant failed to raise the issue on direct appeal and, in addition, there are no "special circumstances", *see* § 645A(c)(1)[1] of the Maryland Uniform Post Conviction Procedure Act, Maryland Code (1957, 1992 Repl. Vol., 1995 Supp.) Article 27, §§ 645A—J, justifying that failure. The majority goes on to opine that, even if not waived, the issue lacks substantive merit. I disagree with both bases for the decision on this point.

In *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Supreme Court held that "reverse *Witherspoon* "[2] questions, *i.e.,* those which seek to determine the prospective jurors' predisposition *in favor of* the death penalty, must be asked in order to avoid a constitutional deficiency. *Id.* at 726, 112 S.Ct. at 2230–31, 119 L.Ed.2d at

---

**1.** Maryland Code (1957, 1992 Repl. Vol., 1995 Cum.Supp.) Article 27, § 645A(c)(1) provides, as relevant:

[A]n allegation of error shall be deemed to be waived when a petitioner could have made, but intelligently and knowingly failed to make, such allegation before trial, at trial, on direct appeal, (whether or not the petitioner actually took such an appeal) ... unless the failure to make such allegation shall be excused because of special circumstances.

**2.** *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). *Witherspoon* questions are those designed to elicit information concerning the prospective juror's attitude *against* the death penalty. *Id.* at 522, 88 S.Ct. at 1770, 20 L.Ed.2d at 785.

504. *See Evans v. State,* 333 Md. 660, 672–73, 637 A.2d 117, 123 (1994). Thus, *"Morgan* simply recognizes that the principles first propounded in *Witherspoon v. Illinois,* [391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) ] 'demand inquiry into whether the views of prospective jurors on the death penalty would disqualify them from sitting.' " *Evans,* 333 Md. at 672–73, 637 A.2d at 123 (quoting *Morgan,* 504 U.S. at 731, 112 S.Ct. at 2231, 119 L.Ed.2d at 504). The Court made clear, however, that "follow the law" type questions and questions that inquire generally into the prospective juror's ability to be fair do not suffice to satisfy that inquiry, it being clear that

> jurors could in all truth and candor respond affirmatively [to such questions], personally confident that such dogmatic views are fair and impartial . . . it may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining . . . dogmatic beliefs about the death penalty would prevent him or her from doing so.

*Morgan,* 504 U.S. at 735, 112 S.Ct. at 2233, 119 L.Ed.2d at 506–07.

The post conviction court recognized, as this Court previously had done in *Evans,* 333 Md. at 672, 637 A.2d at 123, that *Morgan* did not enunciate new law. Nevertheless, it did not rule, as the State had asked it to do, that, by not raising it on direct appeal, the appellant had waived the *Morgan* issue. Instead, the court addressed the merits of the appellant's contention, noting that *Morgan* and *Evans* "flesh[ed] out a very murky area of the law." By taking that approach, at the very least, the post conviction court, found, if only implicitly, sufficient "special circumstances" to excuse the appellant's failure to raise the *Morgan* issue on direct appeal. And because the presence or absence of "special circumstances" is a factual issue, the trial court's finding in that regard is entitled to great deference and, indeed, should not be set aside unless clearly erroneous. See Maryland Rule 8–131(c);[3] *Heat*

---

**3.** Maryland Rule 8–131(c) provides:

(c) Action Tried Without a Jury.—When an action has been tried without a jury, the appellate court will review the case on both the

& *Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 578 A.2d 1202 (1990). The factual finding of special circumstances certainly is not clearly erroneous. The majority, however, approaches the matter as if it involved a question of law. The majority is wrong in doing so.

The majority is also wrong on the merits. The post conviction court acknowledged that this Court, in *Evans,* "specifically" approved four *voir dire* questions that minimally should be asked to qualify the *venire* with respect to the death penalty. That court recognized, at the same time, that, in this case, only two of those questions were actually propounded to the *venire.* To shield the failure of the trial court to ask all four of the questions from the sanction of reversal, the post conviction court relied on the follow up questions that the trial court asked some, but not all, of the prospective jurors. That is also the approach taken by the majority. 343 Md. 256, 276–277, 681 A.2d 30, 40 (1996). In holding that the trial court did not abuse its discretion when it refused to propound the appellant's proposed *voir dire* questions to the prospective jurors, the majority asserts:

> The initial questions were specifically tailored to inquire into a prospective juror's preconceptions regarding the death penalty and to reveal whether those preconceptions would be an obstacle to impartially sentencing the defendant given the facts and the law. The follow-up questions were sufficient to disclose any bias identified in the responses to the initial questions. Together, the questions were sufficient to identify a juror's state of mind concerning the death penalty and the juror's ability to evaluate the evidence impartially.

*Id.* at 277, 681 A.2d at 40. It concluded "that the voir dire questions '[o]n their face ... were clearly sufficient ... to determine whether prospective jurors were death-penalty dogmatists,' and thus, the voir dire satisfied the standard enunci-

---

law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

ated in *Morgan* and *Evans*." *Id.* at 277, 681 A.2d at 40 (quoting *Evans*, 333 Md. at 677, 637 A.2d at 124).

The four questions propounded to the *venire* in this case were:

Do you have any strong feelings, one way or the other, with regards to the death penalty?

Do you feel that your attitude, regarding the death penalty, would prevent or substantially impair you from making a fair and impartial decision on whether the Defendant is not guilty or guilty, based on the evidence presented and the Court's instructions as to the law?

Do you feel your attitude, regarding the death penalty, would prevent or substantially impair you from making a fair and impartial decision on whether the Defendant was or was not criminally responsible by reason of insanity, based on the evidence presented and the Court's instructions on the law?

Do you feel that your attitude, regarding the death penalty, would prevent or substantially impair you from sentencing the Defendant, based upon the evidence presented and the Court's instructions as to the law which is applicable?

By way of contrast, the appellant had requested that the following questions be propounded:

Are there any murders or any type of murders where no matter what excuses or explanations are offered, you would feel that the person responsible should get the death penalty? What are they?

Are there any circumstances which you could consider as a basis for not imposing the death penalty in the case of a person who has been proven guilty of first degree murder?
. . .
Would you be able to vote for a sentence of imprisonment for life, and not death, even though Steven Oken was found guilty of first degree murder, if you found that the aggravating circumstances proven by the state do not outweigh the explanations or mitigating circumstances presented to you by the defendant?

As indicated, the trial court refused to ask any of the questions proposed by the appellant, even though each of them was relevant to the proper qualification of the jury with respect to the death penalty.

In *Evans,* the trial court included in its *voir dire* four questions essentially as follows:

Some feel that the death penalty should be imposed in every case of first degree murder, and others feel that the death penalty should never be imposed. Do you feel or do you have any strong feelings one way or the other about the imposition of the death penalty?

Do you feel that your attitude, regarding the death penalty, would in any way prevent or substantially impair you from making a fair and impartial decision as to the Defendant's sentence in accordance with your oath as a juror, based upon the evidence presented and the Court's instructions as to the law which is applicable?

After listening to the evidence and applying the law, if you were convinced that the appropriate sentence would be death, would you be able to vote for the death penalty? On the other hand, after listening to the evidence and applying the law, if you were not convinced the appropriate sentence should be death, but were convinced life was the appropriate sentence, would you vote for that alternative?

The defendant had asked that the *venire* be asked:

Would the fact that Vernon Evans has been convicted of two first degree murders in this case cause you to automatically vote for the death penalty, regardless of the facts?

This Court was satisfied that "[t]he questions posed to the venirepersons were sufficient to uncover any pro-death penalty bias and measure that bias against the standard for juror exclusion." *Evans,* 333 Md. at 677, 637 A.2d at 125. We accordingly affirmed the trial court's denial of the defendant's requested instruction on that point. *Id.*

Although I dissented on other grounds and did not share, in toto, the majority's rationale, I agreed with the majority's bottom line conclusion on the *Morgan* issue. Therefore, I

joined that part of the opinion. *Id.*, at 700, 637 A.2d at 137 (Bell, J., dissenting). Convinced that the *voir dire* question the defendant sought to have propounded—whether "the fact that Vernon Evans has been convicted of two first degree murders in this case [would] cause you to automatically vote for the death penalty, regardless of the facts"—was relevant to the issue before the court, I rejected the majority's conclusion that "the specific circumstances of a particular crime are irrelevant to one's pre-existing bias or predisposition and thus cannot be factored into the court's evaluation of a jury's ability to judge impartiality." *Id.* at 703, 637 A.2d at 138 (quoting 333 Md. at 675, 637 A.2d at 124–25). Nor was I convinced that the proposed question was deficient for seeking advance clues from the prospective jurors with regard to their assessment of "an important aggravating factor." *Id.* My joining the majority was prompted by my belief that "the *voir dire* questions asked, taken cumulatively, required each prospective juror to come to grips with the issue which the question proposed by the appellant addressed; each had to consider whether he or she would act automatically or only after considering all relevant issues and facts." *Id.*, at 702, 637 A.2d at 138.

This was consistent with my view of the purpose, and the manner, of conducting, *voir dire,* as set forth in my dissenting opinion in *Davis v. State,* 333 Md. 27, 59, 633 A.2d 867, 883 (1993):

> Under Maryland law it is clear that the focal point of *voir dire* is the trial judge. it is the trial judge that has responsibility for regulating and conducting *voir dire.* It is the trial judge that controls the process; he or she determines: what questions to ask on *voir dire;* whether, and when, to allow counsel to ask follow up questions; and whether, and when, a prospective juror is dismissed for cause. It follows, therefore, that it is the trial judge that must decide whether, and when, cause for disqualification exists as to any particular venireperson. Neither the venire

nor the individual venirepersons occupies such an important position.

Thus, I opined, in *Evans,* that

[i]n cases of this kind—when the issue is whether a prospective death penalty juror is predisposed for, or against, the death penalty—the critical inquiry is into the propriety of the trial court's exercise of discretion in determining whether the prospective juror is qualified to sit in that particular case. Ordinarily, ... that inquiry involves a determination of the prospective juror's state of mind, *i.e.,* whether the juror is biased or prejudiced. This, in turn, is informed by how the juror views, and reacts to, the death penalty.

333 Md. at 701, 637 A.2d at 137. Explaining my conclusion that the trial court in *Evans* did not abuse its discretion, I said:

First of all, ... the series of questions which the venire was asked were sufficient to permit the trial court to determine whether a prospective juror was biased or prejudiced to the point where he or she could not render a fair and impartial capital sentencing verdict. To be sure, the information *voir dire* elicited did not focus on identifying which side of the death penalty issue may have caused the prospective juror's apprehension or bias; the purpose of eliciting the information was only to identify its effect from that juror's perspective. And the fact that the *voir dire* was conducted on an individual basis, requiring the prospective juror to answer each of the questions, permitted the trial court to assess each juror's credibility on the basis of factors that could not be discerned from the appellate record.

*Id.* at 702, 637 A.2d at 138 (citing *Wainwright v. Witt,* 469 U.S. 412, 429, 105 S.Ct. 844, 855, 83 L.Ed.2d 841, 855 (1985)).

I continue to adhere to those views. Their application to the case *sub judice* leads to only one conclusion: the death penalty *voir dire* propounded to the *venire* in this case was inadequate to "life qualify" that *venire.* For that reason, I dissent. Accordingly, believing that the appellant is entitled to a new sentencing proceeding, *see Morgan,* 504 U.S. at 739,

n. 11, 112 S.Ct. at 2235, n. 11, 119 L.Ed.2d at 509, n. 11, I would reverse and remand the case for that purpose.

I recognize that, in order to be sufficient, questions put to the *venire* need not be in a specific form or asked in a particular way; they need not be identical to the questions asked in *Evans*. While the formulation need not be uniform, the content and purpose of the questions must be, however. The questions must direct the juror's focus to his or her attitude toward the death penalty and explore how she or he would act when called upon to make the decision meaning life or death to the defendant. The questions must also be designed to provide the court with meaningful information with which it could determine, factually, each juror's credibility both on the basis of the information directly elicited from the prospective jurors and on the basis of intangible factors that cannot be discerned from the appellate record. Because I believe the questions asked in *Evans* minimally did so, a comparison of the questions asked in this case with those asked in *Evans* will demonstrate the inadequacy of the subject *voir dire* questions.

As we have seen, the *voir dire* on the death penalty in the instant case contained only two questions which were substantially similar to the questions we found minimally sufficient in *Evans*.[4] The question concerning the jurors' feeling, one way or the other, is, in form and content, substantially identical to the *Evans'* counterpart. The fourth question asked in this case is substantially identical to the second *Evans* question.

---

4. In *Evans*, we did not purport to approve each individual question as being, by itself, a sufficient question to elicit the appropriate information. Rather, the questions were viewed as a group to determine whether, cumulatively, they had the desired effect. Consequently, when considered in conjunction with the other three questions asked, the second question in *Evans*, the one asking for the juror's bottom line conclusion as to his or her ability, consistent with the evidence and the court's instruction, to reach a fair and impartial decision as to the defendant's sentence, was not considered to be a general fairness and follow the law type question. Viewed by itself, however, it is clear that that is all that it is—it asked the jury to make its assessment and report that assessment to the court. The court is then required to accept that response without in any way exploring the basis for that assessment.

Rather than directing the prospective jurors' attention to factors relevant to each individual juror's attitude toward the death penalty, the critical issue to be addressed at this stage, both it and its *Evans* counterpart ask for each juror's assessment of his or her ability to be fair and impartial concerning the determination of the defendant's sentence, and to abide by the oath and follow the court's instructions. The remaining two questions in this case, those for which there is no *Evans* counterpart, take the same form; their focus, too, is aimed at determining each juror's assessment of his or her ability to be fair and impartial and "follow the law", *albeit* with respect to different, though related issues. In this case, the second question's focus was on the step just prior to sentencing, the determination of the defendant's guilt or innocence. Criminal responsibility was the subject of the third question. Except for the first question, therefore, in this case, in each instance, the only information sought was the juror's assessment of whether he or she would be affected by his or her feelings about the death penalty to the extent that he or she would be unable to follow the court's instructions or the oath he or she took and, consistent with the evidence presented, render a fair and impartial decision with respect to the appellant's culpability, criminal responsibility or the appropriate sentence.

Except for the first question concerning the juror's attitude toward the death penalty, none of the questions asked in this case is sufficient to uncover juror bias. The remaining three questions are, rather, in the nature of general fairness and "follow the law" type questions. *See Bowie v. State*, 324 Md. 1, 23, 595 A.2d 448, 458 (1991); *Morgan*, 504 U.S. at 735, 112 S.Ct. at 2233, 119 L.Ed.2d at 506–07. Such questions are insufficient to meet the *Morgan* requirements, *id.*, and, as such, rendered the *voir dire* inadequate. That is reversible error. *See Bowie*, 324 Md. at 23–24, 595 A.2d at 459.

In *Evans*, the *voir dire* questions we found minimally sufficient consisted of a pro-death question—asking each prospective juror whether he or she would be able to vote for the death penalty if he or she were convinced that it was the appropriate sentence—and a pro-life question—asking the

prospective jurors whether they would be able to vote for life imprisonment as the appropriate sentence when they were convinced that it was. Questions designed to elicit that information were submitted by the appellant, *albeit* in a different form. The information those questions sought to elicit was designed to uncover bias in favor of the death penalty, a cause for disqualification of a juror. *Morgan*, 504 U.S. at 731, 112 S.Ct. at 2230–31, 119 L.Ed.2d at 504; *Evans*, 333 Md. at 677, 637 A.2d at 138–39; *Bowie*, 324 Md. at 23, 595 A.2d at 458. Therefore, the appellant's proposed *voir dire* questions should have been asked. *See Hill v. State*, 339 Md. 275, 279, 661 A.2d 1164, 1166 (1995); *Davis v. State*, 333 Md. at 35, 633 A.2d at 871; *Bowie*, 324 Md. at 23–4, 595 A.2d at 456; *Casey v. Roman Catholic Archbishop*, 217 Md. 595, 605, 143 A.2d 627, 631 (1958). The failure of the trial court to propound those questions to the *venire* was error, rendering the *voir dire* inadequate and requiring reversal of the appellant's death sentence, *Bowie*, 324 Md. at 23–4, 595 A.2d at 459.

The majority recognizes that the questions asked in the instant case were not the equivalent of those asked in the *Evans* case. Nevertheless, the majority is impressed by the fact that the trial judge asked follow-up questions of those prospective jurors' whose responses to any one of the four questions was in the affirmative or indicated that clarification was needed. Those follow-up questions, it says, were sufficient to salvage the death penalty *voir dire*. As the appellant points out, however, the problem with the majority approach is that follow-up questions were only asked of some prospective jurors, when the prospective juror answered a question in the affirmative or ambiguously. No follow-up questions were asked of those jurors who answered "no" to all of the questions. As the appellant recognizes and points out:

> It is quite possible that a prospective juror could harbor pro-death penalty sentiments yet still answer "No" to the question posed by the trial court herein regarding strong feelings (death penalty voir dire question No. 1). For instance, a prospective juror could answer "No" to question No. 1 but still always favor the imposition of the death

penalty in cases involving first degree felony murder where the underlying felony is a six offense, the circumstances of this case. In effect, this juror would not have "strong feelings" for or against the death penalty in general but only in limited circumstances not addressed by the overly broad nature of the court's questions. However, under the trial court's method of questioning, there would be no way to elicit this information since no follow-up questions would be asked in order to determine the basis for the "No" answer.

The Appellant's Reply Brief at 5. *See also State v. Conner,* 335 N.C. 618, 440 S.E.2d 826, 840 (1994) (citation omitted). *Morgan,* as we have seen, also recognized this possibility when the death penalty *voir dire* questions are general fairness and "follow the law" type questions, as I believe these are, which do not focus the attention of each *venireperson* to his or her attitude toward the death penalty. 504 U.S. at 735, 112 S.Ct. at 2233, 119 L.Ed.2d at 506.

To the trial court, and apparently the majority agrees, it is significant that the record of the *voir dire* proceedings does not disclose affirmatively that any person who sat on the jury had a predisposition in favor of the death penalty. Where, however, as here, the death penalty *voir dire* is inadequate, it is not surprising that the record will not disclose such bias. Where questions designed to uncover pro-death penalty bias were not asked of all jurors as a matter of course, it can be, and, indeed, it should be, expected that prospective jurors can, and will, be accepted for jury service without their predispositions and biases properly and adequately having been explored. Moreover, the failure to explore the predisposition and biases of such jurors, because it rendered impossible any determination that any one or more of them was, in fact, biased, dooms to failure the "harmless error" argument that the trial court and the majority seem also to be espousing. *See Bowie,* 324 Md. at 11, 595 A.2d at 453. In any event, under *Morgan,* what is relevant is whether the prospective jurors were adequately *voir dired,* not whether the record discloses any juror bias, the uncovering of which was the only

purpose of asking the questions in the first place. It seems to me perfectly clear that if the death penalty *voir dire* is inadequate, the absence of an affirmative showing on the record that any one of the prospective jurors was biased in favor of the death penalty does not mean that no members of the jury were biased. What biases a juror may or may not have, under the circumstances, could only be the subject of speculation; therefore, a new sentencing hearing is required.

When the defendant was tried in this case, he had already pled guilty to first degree murder in Maine and been sentenced there to life imprisonment without parole. As its name implies, that sentence meant that he was ineligible for parole and would have to serve all of his sentence; he was required to be imprisoned for the remainder of his life. That sentence was an accomplished fact. It was not a contingency which could only become a reality upon the Maryland jury impaneled to try the appellant's case determining that a sentence of life imprisonment without parole was the appropriate sentence in this case.

Maryland law requires the consideration of aggravating and mitigating circumstances and the weighing of those circumstances to determine the proper sentence. *See* Maryland Code (1957, 1992 Repl. Vol., 1995 Cum.Supp.) Art. 27 § 413(d), (g), and (h). Section 413(g)(8), dealing with mitigating circumstances, permits the sentencing jury to find as a mitigating circumstance "[a]ny other facts which [it] ... specifically sets forth in writing." To be sure, the appellant's counsel told the jury, in opening statement, that the appellant was serving a life without parole sentence in Maine, and even argued that it could be considered a nonstatutory mitigating circumstance. The appellant's counsel did not, however, offer proof of the Maine sentence during the sentencing proceedings. Nor did he request a jury instruction informing the jury that it could consider the Maine sentence in determining whether there were mitigating circumstances applicable to the appellant. Moreover, the appellant's counsel did not object when the trial court instructed the jury concerning the appellant's parole eligibility in prospective terms, *i.e.* that "should [the appellant]

receive a sentence of life imprisonment or life imprisonment without the possibility of parole, [that sentence] may be taken into account by you in your consideration of mitigating circumstances as well as in your determination of whether the appropriate sentence is death or life imprisonment." And the appellant's counsel did not ask the court to answer the jury's question concerning the possibility of the appellant's being released even if he were sentenced to life without parole by informing it that the appellant had already been sentenced to life without parole in Maine and by instructing it that that fact also has a bearing on whether the appellant would ever be released and, indeed, could itself be dispositive.

The post conviction court, denying relief, found and relied upon the facts that the appellant's counsel told the jury in closing argument that the appellant was already under a sentence in Maine of life without parole and that the trial court instructed the jury that, in the case it was trying, it could sentence the appellant to life without parole and consider that sentence as a nonstatutory mitigating circumstance. Accepting those rationales, the majority upholds the denial of post conviction relief on that ground as well.

The standard for determining whether there has been ineffective assistance of counsel is whether trial counsel's performance fell below prevailing professional norms and whether that deficiency prejudiced the appellant. *State v. Thomas,* 328 Md. 541, 556, 616 A.2d 365, 373 (1992), *cert. denied,* 508 U.S. 917, 113 S.Ct. 2359, 124 L.Ed.2d 266 (1993). To meet the latter standard, the defendant must show that, but for the unreasonableness of his or her counsel's performance, there is a "substantial possibility" that the outcome of the trial may have been different. *Williams v. State,* 326 Md. 367, 376, 605 A.2d 103, 107 (1992); *Bowers v. State,* 320 Md. 416, 425–26, 578 A.2d 734, 738–39 (1990). The standard is no longer simply "outcome determinative." "An analysis focusing on mere outcome determination without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct.

838, 842, 122 L.Ed.2d 180, 189 (1993); *Sampson v. State,* 506 N.W.2d 722, 726 (N.D.1993).

The record in this case, clearly in my view, demonstrates ineffective assistance of counsel. The trial court was clearly erroneous in concluding otherwise. Accordingly, on this ground as well, the appellant is entitled to a new sentencing proceeding.

In Maryland, it is well settled that arguments of counsel are not evidence, a fact of which juries regularly are reminded by pointed jury instructions to that effect. On the other hand, it is at least as well settled in this State that the focal point—the most important personality—in a jury trial is the trial judge, to whom the jury more likely than not will defer. *See State v. Hutchinson,* 287 Md. 198, 206, 411 A.2d 1035, 1040 (1980) ("The trial judge is the central figure at trial, having the chief responsibility of steering the jury through the maze of evidence. In such role, the trial judge may influence the jury by the inflection of his voice, his words, his conduct and his assessment of the evidence, if known."). Consequently, it can be expected that the jury will pay greater attention to what the trial judge instructs than to the arguments a defendant's counsel might make. Indeed, this Court, in *Williams v. State,* 322 Md. 35, 47, 585 A.2d 209, 215 (1991), held that arguments of counsel can not effectively substitute for instructions by the court. (Quoting *Taylor v. Kentucky,* 436 U.S. 478, 488–89, 98 S.Ct. 1930, 1936, 56 L.Ed.2d 468, 477 (1978)). In a concurring opinion, Justices Souter and Stevens made the same point. *Simmons v. South Carolina,* 512 U.S. 154, ——– ——, 114 S.Ct. 2187, 2198–99, 129 L.Ed.2d 133, 141 (1994) (quoting *Boyde v. California,* 494 U.S. at 384, 110 S.Ct. at 1200, 108 L.Ed.2d at 331). It is not surprising, therefore, that the United States Supreme Court has recognized that:

> [A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as a statement of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law.

*Boyde v. California,* 494 U.S. 370, 384, 110 S.Ct. 1190, 1200, 108 L.Ed.2d 316, 331 (1990). *See also Johnson v. State,* 325 Md. 511, 519, 601 A.2d 1093, 1096–97 (1992).

It is also significant that, in response to arguments characterizing an improper argument by counsel as prejudicial, the appellate courts of this State have frequently relied on the instruction that arguments of counsel are not evidence, at least as a partial basis, to avoid ordering reversals of convictions or, in capital cases, the capital sentence. *See, e.g., Evans,* 333 Md. at 682, 637 A.2d at 128; *Oken v. State,* 327 Md. 628, 677, 612 A.2d 258, 282 (1992); *Booth v. State,* 327 Md. 142, 178, 608 A.2d 162, 179 (1992); *Tully v. Dasher,* 250 Md. 424, 436, 244 A.2d 207, 214 (1968); *Nicholson v. Blanchette,* 239 Md. 168, 176, 210 A.2d 732, 736 (1965); *Market Tavern, Inc. v. Bowen,* 92 Md.App. 622, 657, 610 A.2d 295, 313 (1992); *Marks v. State,* 84 Md.App. 269, 292, 578 A.2d 828, 839–40 (1990); *Hairston v. State,* 68 Md.App. 230, 241, 511 A.2d 73, 78 (1986); *McDowell v. State,* 31 Md.App. 652, 665, 358 A.2d 624, 631 (1976); *Murphy v. Board of County Comm'rs,* 13 Md.App. 497, 503, 284 A.2d 261, 265 (1971). These rulings are premised, no doubt, on the presumption that juries follow the trial court's instructions. *See e.g., Poole v. State,* 295 Md. 167, 175, 453 A.2d 1218, 1223 (1983); *Washington v. State,* 293 Md. 465, 471, 445 A.2d 684, 687 (1982); *State v. Moulden,* 292 Md. 666, 679 n. 8, 441 A.2d 699 n. 8 (1982); *Blanchfield v. Dennis,* 292 Md. 319, 325, 438 A.2d 1330, 1333 (1982); *Stevenson v. State,* 289 Md. 167, 191, 423 A.2d 558, 571 (1980) (Eldridge, J., dissenting); *Wilson v. State,* 261 Md. 551, 570, 276 A.2d 214, 224 (1971); *Hunter v. State,* 193 Md. 596, 604, 69 A.2d 505, 508 (1949); *Cohen v. State,* 173 Md. 216, 232, 195 A. 532, 539 (1937), *cert. denied,* 303 U.S. 660, 58 S.Ct. 764, 82 L.Ed. 1119 (1938).

There can be no doubt that the appellant was already under a sentence of life imprisonment without parole. Nor can it be doubted that there is a significant difference between an event that has already occurred and a contingency. The difference is even more pronounced when the contingency is critical to the ultimate decision required to be made in the case and the

very jury that is charged with making that decision must also decide how to resolve the contingency. Therefore, it should have been argued, as it was, *albeit* somewhat ambiguously, that the Maine sentence was a nonstatutory mitigator and, on the basis of that fact alone, the appellant's counsel should have sought a jury instruction to that effect. It is true that the presentence report also indicated that the appellant was subject to the Maine sentence and accurately characterized it, proving the sentence, and its meaning, by reference to court records and judicial pronouncements and causing the jury to be instructed consistent therewith, would have been more persuasive and forceful. Moreover, that would have forced the jury to come to grips with a present reality, rather than grappling with how it should handle a prospective one. This is particularly the case when, as here, whether, and how, that sentence could be used by the jury to determine the appropriate sentence in this case was, at best, ambiguous. The court never instructed the jury as to the effect of the Maine sentence, notwithstanding there being conflicting arguments on the issue. The prosecutor told the jury, in closing argument, that it should disregard the Maine sentence and focus on the Maryland sentence only. As we have seen, the appellant's counsel argued just the opposite.[5]

The ineffective assistance the appellant received was also prejudicial. It is impossible to determine what the jury would have done had counsel sought and received an instruction with regard to the Maine life imprisonment without parole sentence and also caused the trial court to respond to the jury's question relative to the possibility of the appellant's release by referencing the fact that the appellant was already serving a

---

5. The State raised the question of the appellant's future dangerousness. It is interesting to note that the appellant's response focused entirely on the effect of the Maryland proceedings. Whether, and how, the Maine sentence was relevant was, at best, a secondary consideration. To the extent it was mentioned at all, it was only by way of counsel's argument. Indeed, it was in the context of the pending jury sentence that the trial court defined "life without parole"; whether that definition also applied to the Maine sentence was left to the jury to determine and, then, only by implication.

life sentence without parole. That, based only on counsel's argument, at least one juror found the Maine life sentence without parole to be a mitigating circumstance, is telling in that regard.